PALMIERI, Senior District Judge:
 

 The indictment containing seventeen counts (Davis having been named in fourteen) charged Davis and three co-defendants with various charges arising out of a scheme contrived and executed during the years 1973-1978 which involved the payment of multi-million dollar kickbacks to executives of General Dynamics Corporation in return for the approval of subcontracts awarded by General Dynamics to
 
 *1027
 
 Frigitemp Corporation of New York City (“Frigitemp”), of which Davis was a Senior Vice President.
 

 The Government’s evidence can be deemed to support jury findings to the following effect: During the 1970’s, Davis was a Senior Vice President of Frigitemp, which acted as a subcontractor on major commercial and naval shipbuilding projects. From 1973 to 1977, Frigitemp was awarded over $44 million in subcontracts from two shipbuilding divisions of General Dynamics Corporation, the Quincy Shipbuilding Division (“QSD”) in Quincy, Massachusetts, and the Electric Boat Division (“EB”) at Groton, Connecticut. In return for the award of these subcontracts, Frigitemp paid $2.7 million in kickbacks to two key executives of General Dynamics responsible for approving the award of the subcontracts: P. Takis Veliotis, President and General Manager of QSD until 1977 and General Manager of EB after 1977, and James H. Gilliland, Veliotis’ principal assistant at QSD.
 

 The principal actor in the scheme was Davis, who first proposed the payment of kickbacks to Veliotis and Gilliland. A fund of over $5 million to pay the kickbacks was devised by Davis by creating and submitting to Frigitemp for payment a series of fictitious “consulting contracts” and materials invoices in the names of sham Cayman Island corporations, for non-existent consulting services and raw materials.
 

 Davis also organized and supervised the laundering of the kickback fund through an elaborate network of bank accounts in the United States, Canada, the Cayman Islands and Switzerland, and carried out the actual payment of the kickbacks through a series of wire transfers to secret numbered Swiss bank accounts of Veliotis and Gilli-land. In the course of carrying out the kickback scheme, Davis secretly diverted nearly half of the $5 million fund to himself.
 

 Davis’ co-defendant Gerald E. Lee, chief executive officer of Frigitemp, pleaded guilty to the racketeering conspiracy charge and a conspiracy charge contained in a second indictment, testified at trial, and was sentenced by Judge Conner to concurrent sentences of 18 months imprisonment. The other two co-defendants, James H. Gilliland and P. Takis Veliotis, became fugitives so that Davis stood trial alone.
 
 [2]
 

 Davis seeks reversal on three grounds. First, he claims that records of his Swiss bank accounts were procured by the Government in contravention of applicable treaty provisions and were therefore inadmissible; and further, that their admission in evidence violated his rights of confrontation. Second, he claims that the District Court improperly procured the production of certain bank records of the Cayman Islands Branch of the Bank of Nova Scotia. Third, he contends that the evidence at trial was insufficient to support his conviction for bankruptcy fraud charged in Count 14. We deal with these objections seriatim.
 

 I.
 
 The Swiss Bank Records
 

 In October 1981, almost two years before the return of the indictment, the Government availed itself of the Treaty between the United States and Switzerland on Mutual Assistance in Criminal Matters, May 25, 1973, 27 U.S.T. 2019, T.I.A.S. No. 8302 (the “Treaty”),
 
 [3]
 
 to seek out records of Swiss bank accounts used in the scheme, including those maintained by Davis.
 
 [4]
 

 
 *1028
 
 Following the procedure set forth in the Treaty,
 
 [5]
 
 the Central Authority approved the request and transmitted it to the Examining Magistrate for the canton in which Davis’ accounts were located for issuance of orders to the banks to produce the required records. On February 8, 1982, the Swiss Magistrate directed the Swiss Bank Corporation and the Credit Suisse (the two Zurich banks where Davis maintained accounts) to produce the records and to swear to their authenticity as genuine business records maintained in the regular course of business. On February 19, 1982, Davis’ Swiss attorney became aware of the October 1981 document request
 
 [6]
 
 and filed a notice of protest in the Swiss courts.
 
 [7]
 
 As provided for in the Treaty, a hearing (referred to here for convenience as an authentication hearing) was held in June 1982. At that time, the bank employees produced written affidavits certifying that the documents produced were authentic business records maintained in the regular course of business. In addition, as provided in paragraphs 1 through 3 of Article 18 of the Treaty, the Magistrate before whom the documents were produced examined the bank employees under oath, satisfied himself as to the authenticity of the records, and attested to their authenticity under his official seal. Specifically, the examining Magistrate made the following findings in the certificate of authenticity:
 

 
 *1029
 
 I have examined the documents, and have interrogated under oath the person who produced them. As a result of this examination and interrogation, I am satisfied that these documents are genuine; that they were made as memoranda or records of acts, transactions, occurrences or events; that they were made in the regular course of business; and that it was a regular practice of that business to make such a document at the time of the act, transaction, occurrence or event recorded therein or within a reasonable time thereafter.
 

 Finally, pursuant to paragraph 4(a) of Article 18 of the Treaty, the bank records and certificate of authenticity were certified as genuine by the Central Authority of Switzerland. The bank records and certificates were then transmitted to the United States Government.
 

 Davis was not notified of the authentication hearing and was not present at the hearing. Davis made no application to attend the hearing.
 

 On appeal, Davis presents two arguments in support of his claim that the Swiss bank records were improperly admitted. First, he contends that the Government violated the Treaty by failing to notify him of the authentication hearing. Second, Davis argues that in light of the failure to notify him of the authentication hearing the admission of the Swiss bank records deprived him of his confrontation rights under the Sixth Amendment. Neither claim is valid.
 

 A.
 
 Treaty Violation
 

 Davis contends that the Zurich Bank records were procured in violation of Article 18, paragraph 5 of the Treaty and that the records should therefore have been excluded. That paragraph provides as follows:
 

 “Where a request under this Article pertains to pending court proceedings, the defendant
 
 [8]
 
 ,
 
 upon his application,
 
 may be present or represented by counsel or both, and may examine the person producing the document as to its genuineness and admissibility. In the event the defendant elects to be present or represented, a representative of the requesting State or a state or canton thereof may also be present and put such questions to the witness.” (Emphasis added.)
 

 At the outset, it must be noted that Davis has no standing to raise this purported Treaty violation before this Court.
 
 See United States v. Johnpoll,
 
 739 F.2d 702, 714 (2d Cir.),
 
 cert. denied
 
 — U.S. -, 105 S.Ct. 571, 83 L.Ed.2d 511 (1984). Article 37 of the Treaty provides that: .
 

 “[t]he existence of restrictions in this Treaty shall not give rise to a right on the part of any person to take any action in the United States to suppress or exclude any evidence or to obtain other judicial relief in connection with requests under this Treaty, except with respect to [certain enumerated paragraphs.]”
 

 One of the enumerated paragraphs, paragraph 7 of Article 18, provides that “[i]n the event that the genuineness of any document authenticated in accordance with Article is denied by any party” that party shall have the burden of establishing that the document is not genuine. Since Davis has never contested the genuineness of the documents, paragraph 7 is not implicated.
 

 That Davis has no standing to raise a purported violation of Article 18, Paragraph 5 of the Treaty in this context is made absolutely clear by both the interpretative letters signed by the United States and Switzerland and by the Technical Analysis of the Treaty. The interpretative letters signed on May 25, 1973 provide that it is the understanding of the United States and Swiss governments that a person alleging a violation of Article 5 of the Treaty (which deals with limitations on the use of information obtained pursuant to the Treaty) “has no standing to have such allega
 
 *1030
 
 tions considered in any proceeding in the United States... [H]is recourse would be for him to inform the Central Authority of Switzerland for consideration only as a matter between governments.” 27 U.S.T. at 2128-38. The Technical Analysis provides that “restrictions in the Treaty shall not give rise to a right of any person to take action to suppress or exclude evidence or to obtain judicial relief.”
 
 Technical Analysis of the Treaty between the United States and Switzerland on Mutual Assistance in Criminal Matters
 
 (reprinted in
 
 Message from the President Transmitting the Treaty with the Swiss Confederation on Mutual Assistance in Criminal Matters,
 
 94th Cong., 2d Sess. at 63-64 (1976)).
 
 See Cardenas v. Smith,
 
 733 F.2d 909, 918 (D.C.Cir.1984). More generally, this Court has written that “even where a treaty provides certain benefits for nationals of a particular state — such as fishing rights — it is traditionally held that ‘any rights arising from such provisions are, under international law, those of states and ... individual rights are only derivative through the states.’ ”
 
 United States Ex Rel. Lujan v. Gengler,
 
 510 F.2d 62, 67 (2d Cir.),
 
 cert. denied,
 
 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975), quoting
 
 Restatement (Second) of the Foreign Relations Law of the United States
 
 § 115, comment e (1965) (criminal defendant abducted in Bolivia and brought to the United States for trial had no standing to raise violation of the charters of the United Nations and the Organization of American States in the absence of protest by a signatory state).
 
 See also United States v. Reed,
 
 639 F.2d 896, 902 (2d Cir.1981) (criminal defendant abducted in Bahamas in violation of extradition treaty had no standing to raise its violation in absence of protest by the Bahamas).
 

 Given the clear and unambiguous language in Article 37 of the Treaty reflecting the intention of the signatory states that the Treaty would not — except in certain specifically designated circumstances — confer judicially enforceable rights on individuals
 
 [9]
 
 and the absence of any protest from either Switzerland or the United States, Davis has no standing to move to exclude or suppress the Swiss Bank records on the basis of a purported violation of Article 18, paragraph 5.
 

 Apart from Davis’ lack of standing to complain about the alleged non-compliance with the provisions of Article 18, paragraph 5, of the Treaty, it is clear that the Government did not violate the Treaty by failing to give Davis notice of the authentication hearing.
 

 Under paragraph 5, the right to be present or represented at the authentication hearing arises only after the defendant makes an application. Davis concedes that paragraph 5 contains no explicit notice requirement, but argues that by implication the paragraph imposes upon the Government an affirmative obligation to notify the defendant whose records are the subject of a request under the Treaty. We disagree.
 

 Davis’ argument is not entirely without merit, however. Paragraph 5 — viewed in isolation — could reasonably be interpreted as imposing a notice requirement on the Government. It could be urged that unless a defendant knows that a hearing is being held, he cannot very well make an application to attend or be represented at the hearing. But, the paragraph cannot be viewed apart from other provisions of the Treaty.
 

 Article 36 of the Treaty addresses the issue of notice. That Article, which is set forth in the margin,
 
 [10]
 
 imposes certain no
 
 *1031
 
 tice requirements on the state whose assistance has been requested.
 
 [11]
 
 It imposes no notice requirements on the requesting state. The burden, if any, of notifying Davis that he was the subject of a request for assistance under the Treaty thus fell upon Switzerland not the United States.
 

 In view of the complete absence of any language in the Treaty imposing a notice requirement on the requesting state and the intent of the signatory states that the Treaty would simplify and expedite the procedures for obtaining information,
 
 [12]
 
 this Court is reluctant to erect unnecessary procedural obstacles in the path of international judicial assistance.
 

 In addition, Davis was afforded numerous opportunities to contest the authenticity of the bank records and consistently declined to do so. First, Davis has conceded that he was aware as early as February 19, 1982 — several months before the authentication hearing was held — that the United States had made a request for his bank records under the Treaty. Davis should have been aware that under the terms of the Treaty there would be authentication hearings which he had the right to attend on request. Yet, Davis never requested the opportunity to appear or to be represented at these hearings. Second, pri- or to the trial, the Government moved for an order that the bank records procured pursuant to the Treaty provisions be deemed admissible at the trial “unless the defendant Davis satisfies the Court that such records are not genuine.” In reply, Davis made precisely the same claim he makes here. Judge Conner ruled that the records would be accepted as genuine “unless Davis can establish their lack of authenticity” adding that Davis “knew the Government had requested the records and should have known that under the terms of the Treaty, there would be authenticity hearings which he had a right to attend on request.” Judge Conner also pointed out that Davis did “not even now suggest any reason for questioning the authenticity of the documents”. Judge Conner’s rulings and comments were amply justified by the record before him. Third, at no time before or during the trial did Davis seek to question the authenticity of the bank records. This remained true when he testified in his own behalf and admitted their genuineness. In view of all these circumstances, Davis cannot now successfully challenge the authenticity and admissibility of the Swiss Bank records.
 

 B.
 
 Right to Confrontation
 

 Davis also argues that the admission of the Swiss bank records violated his Sixth Amendment right to confront the witnesses who appeared at the authentication hearing. This claim must be rejected. It is well established that the Confrontation Clause does not preclude the admission of all extra-judicial statements when the de-clarant is not present at trial. Indeed, numerous exceptions to the hearsay rule have routinely been held to be consistent with the Confrontation Clause.
 
 [13]
 

 See, e.g., United States v. Kelly,
 
 349 F.2d 720, 770
 
 *1032
 
 (2d Cir.1965),
 
 cert. denied,
 
 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966) (past recollection recorded). To survive a Confrontation Clause challenge, the statement must bear sufficient indicia of reliability to assure an adequate basis for evaluating the truth of the declaration.
 
 See Dutton v. Evans,
 
 400 U.S. 74, 89, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970);
 
 Oates, supra,
 
 560 F.2d at 81. Here, the Swiss bank records bore the best possible indication of reliability— Davis’ admission of their authenticity. In light of the rigorous procedures used to authenticate the documents and Davis’ concession, it is highly unlikely that Davis’ presence at the hearing (or the authenticating witnesses’ presence at the trial) would have weakened the reliability of the records.
 
 See United States v. Puco,
 
 476 F.2d 1099, 1104 n. 8 (2d Cir.),
 
 cert. denied,
 
 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973).
 
 Compare Oates, supra,
 
 560 F.2d at 81-82. Finally, Davis had full opportunity to challenge the authenticity of the documents yet he chose not to do so.
 
 See United States v. Johnpoll,
 
 739 F.2d 702, 710 (2d Cir.),
 
 cert. denied,
 
 — U.S. -, 105 S.Ct. 571, 83 L.Ed.2d 511 (1984) (deposition testimony of five Swiss witnesses obtained pursuant to the Treaty properly admitted over Sixth Amendment objections).
 

 II.
 
 The Cayman Island Bank Records
 

 On May 19, 1984, five weeks prior to trial, the Government issued a trial subpoena duces tecum to the Cayman Islands Branch of the Bank of Nova Scotia (“the Bank”) directing it to produce bank documents relating to accounts used by Davis in furtherance of his kickback and laundering operations. Under Cayman Law, disclosure of bank records is generally prohibited, but a customer’s records may be disclosed if the customer consents or if the Cayman Grand Court orders disclosure.
 
 [14]
 
 Although the Bank and the Cayman Islands authorities were disposed to comply, the Government was concerned — based on its prior experiences with Davis — that he would seek to prevent the Bank from obtaining an order from the Cayman Grand Court which would allow the Bank to comply with the subpoena. In fact, in April 1983 Davis had obtained a temporary restraining order from the Court of Appeals in Jamaica preventing the Bank from producing Davis’ records to the Cayman police. Accordingly, the Government moved for an order directing Davis not to interfere further with the compliance efforts of the Bank and to execute a direction to authorize compliance by the Bank and not “to object, engage in litigation, or other
 
 *1033
 
 wise seek to delay or hinder production of documents in response to said subpoena.”
 

 On June 14, 1984, after briefing and argument, the District Court directed Davis to:
 

 “take whatever steps are necessary to allow the Bank of Nova Scotia branch in the Cayman Islands to comply with the subpoena that has been served upon it in connection with this proceeding, and I will instruct Davis’ counsel to inform him and their associate counsel in the Cayman Islands to that effect forthwith.”
 

 The District Court also ordered Davis to sign a form directing the Bank to produce the records. The Court provided that the directive could not be used against Davis at trial either to authenticate the bank records or otherwise. Davis signed the directive, ceased his litigation in the Cayman Islands, and disclosure was made pursuant to an order of the Cayman Grand Court.
 

 Davis presents three principal arguments on appeal. First, Davis contends that the bank records were obtained in violation of Cayman law and that the District Court therefore erred in admitting them. Second, Davis argues that the District Court improperly ordered him to cease his Cayman Islands litigation. Third, Davis argues that the District Court’s order compelling him to sign the directive to the Cayman Bank violated his Fifth Amendment right against self-incrimination.
 

 A.
 
 The Compelled Consent
 

 Davis argues that under Cayman law, a bank which has disclosed customer records in response to a “consent directive” obtained pursuant to an order of a foreign court may be subject to criminal liability under the Cayman Confidential (Relationships) Preservation Law. Davis further contends that under the law of this Circuit a court may not compel a bank to disclose customer records located abroad when such disclosure would subject the bank or its employees to criminal liability in that jurisdiction. He therefore concludes that the Cayman bank records should not have been admitted because the Bank will be subject to criminal prosecution in Cayman.
 

 Davis’ argument is flawed. The issue on appeal is not whether the “so ordered” trial subpoena served on the Bank was properly issued, but whether the District Court order commanding
 
 Davis
 
 to issue a directive to the Bank consenting to the disclosure was proper. While Davis’ solicitude for the plight of a bank confronted with potential conflicting legal commands may be commendable, that issue is more properly raised by the bank.
 
 [15]
 

 Despite this, Davis’ objection may not be so easily dismissed. Over the last thirty years, courts have imposed certain limitations on the power of a federal court to order a bank to produce records located in a state which proscribes their disclosure. These limitations have been engendered both by a concern for the hardship imposed on the subject of the order and a respect for the national interests of the state where the records are located. The Second Circuit, as well as several others, has used an analysis derived from § 40 of the
 
 Restatement (Second) of the Foreign Relations Law of the United States
 
 (1965) in evaluating the propriety of a subpoena directing the production of information or documents located abroad where such production would violate the law of the state in which the documents are located.
 
 See Trade Development Bank v. Continental Insurance Co.,
 
 469 F.2d 35 (2d Cir.1972);
 
 United States v. First National City
 
 
 *1034
 

 Bank,
 
 396 F.2d 897, 901 (2d Cir.1968);
 
 United States v. Chase Manhattan Bank, N.A.,
 
 584 F.Supp. 1080 (S.D.N.Y.1984);
 
 Garpeg, Ltd. v. United States,
 
 583 F.Supp. 789 (S.D.N.Y.1984);
 
 S.E.C. v. Banca Della Svizzera Italiana,
 
 92 F.R.D. 111, 114-16 (S.D.N.Y.1981);
 
 United States v. First National Bank of Chicago,
 
 699 F.2d 341, 345 (7th Cir.1983);
 
 United States v. Bank of Nova Scotia (“Nova Scotia F’),
 
 691 F.2d 1384, 1389 n. 7 (11th Cir.1982),
 
 cert. denied,
 
 462 U.S. 1119, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983);
 
 United States v. Vetco,
 
 691 F.2d 1281, 1288 (9th Cir.),
 
 cert. denied,
 
 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981). Section 40
 
 [16]
 
 provides:
 

 Limitations on Exercise of Enforcement Jurisdiction
 

 Where two states have jurisdiction to prescribe and enforce rules of law and the rules they may prescribe require inconsistent conduct upon the part of a person, each state is required by international law to consider, in good faith, moderating the exercise of its enforcement jurisdiction, in the light of such factors as
 

 a) vital national interests of each of the states,
 

 b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person,
 

 c) the extent to which the required conduct is to take place in the territory of the other state,
 

 d) the nationality of the person, and
 

 e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.
 

 This Court is aware that in recent years litigants have often attempted to circumvent these limitations by seeking an order compelling the record-owner to consent to the disclosure of the records.
 
 See, e.g., United States v. Ghidoni,
 
 732 F.2d 814 (11th Cir.),
 
 cert. denied
 
 — U.S. -, 105 S.Ct. 328, 83 L.Ed.2d 264 (1984);
 
 United States v. Chase Manhattan Bank, N.A.,
 
 584 F.Supp. 1080 (S.D.N.Y.1984);
 
 Garpeg, Ltd. v. United States,
 
 583 F.Supp. 789 (S.D.N.Y.1984). However, because such an order may also trench upon the interests of another state, a court is required to strike
 
 *1035
 
 a careful balance between the competing national interests and the extent to which these interests would be impinged upon by the order.
 

 The United States has a strong national interest in the effective enforcement of its criminal laws.
 
 Cf. Bank of Nova Scotia I, supra,
 
 691 F.2d 1384 (strong United States interest in upholding grand jury’s power to investigate crimes);
 
 United States v. Field,
 
 532 F.2d 404 (5th Cir.),
 
 cert. denied,
 
 429 U.S. 940, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976) (same);
 
 United States v. First National City Bank,
 
 396 F.2d 897, 903 (2d Cir.1968) (strong U.S. interest in enforcing the antitrust laws);
 
 S.E.C. v. Banca Della Svizzera Italiana,
 
 92 F.R.D. 111 (S.D.N.Y.1981) (strong United States interest in enforcing the securities laws);
 
 Vetco, supra,
 
 691 F.2d at 1289 (strong United States interest in collecting taxes and prosecuting tax fraud).
 
 But cf. United States v. First National Bank of Chicago,
 
 699 F.2d 341 (7th Cir.1983) (United States interest in collection of taxes outweighed by Greece’s interest in bank secrecy). Furthermore, the Cayman Bank records were essential to the Government’s ease — a point acknowledged by Davis at oral argument.
 
 Compare Trade Development Bank, supra,
 
 469 F.2d at 40 (“relative unimportance” of information sought);
 
 First National Bank of Chicago, supra,
 
 699 F.2d at 346 (same).
 

 In contrast, while the Cayman Islands has a vital national interest in preserving the privacy of its banking customers,
 
 [17]
 
 the statute does not provide a blanket guarantee of privacy and has many exceptions.
 
 See Nova Scotia II,
 
 740 F.2d at 827 n. 15. In addition, since American citizens are required to reveal the existence of foreign bank accounts and report certain foreign transactions by American law,
 
 [18]
 
 Cayman national interests are not impinged upon to the extent that the subpoenaed records contain information which Davis was required to disclose under American law. We also note that the Cayman Attorney General, after consultation with the United States Government, agreed to support the Bank’s efforts to obtain a Cayman court order authorizing the disclosure of the records. Appellee’s Brief at 3a. The absence of any objection by the Cayman government to the subpoena and subsequent order, and the affirmative cooperation of the Cayman Attorney General is significant.
 
 See First National City Bank, supra,
 
 396 F.2d at 904 (“when foreign governments ... have considered their vital national interests threatened, they have not hesitated to make known their objections”). Furthermore, the Cayman Islands has a policy against the use of its business secrecy laws to “encourage or foster criminal activities.”
 
 Nova Scotia II, supra,
 
 740 F.2d at 829. The court therefore concludes that Cayman has no strong national policy interests which would be affected by disclosure of Davis’ bank records.
 

 In balancing the United States and Cayman interests, we are cognizant that the subpoena and subsequent order arose in the course of a criminal suit brought by the United States Government. We must therefore accord some deference to the determination by the Executive Branch — the arm of the government charged with primary responsibility for formulating and effectuating foreign policy — that the adverse diplomatic consequences of the discovery request would be outweighed by the benefits of disclosure.
 
 See Vetco, supra,
 
 691 F.2d at 1289 n. 9;
 
 Restatement (Revised)
 
 § 420 reporter’s note 9 (Tent. Draft No. 3 1982).
 

 After carefully analyzing the competing national interests, we conclude that the District Court properly ordered Davis to
 
 *1036
 
 direct the bank to comply with the trial subpoena.
 
 [19]
 

 B.
 
 The Order Directing Davis to Terminate His Cayman Litigation
 

 Davis argues that the District Court improperly ordered him to cease his Cayman Islands litigation and that the bank records obtained as a result of Davis’ compliance with the order should therefore be excluded. Because we find that in this case the District Court properly exercised its power, we reject Davis’ claim.
 

 At the outset, we note that the Government has cited no authority for the proposition that a United States Court may order a criminal defendant to refrain or desist from pursuing litigation before a foreign tribunal designed to block compliance with a subpoena. While this Court is aware of several cases — including the instant one
 
 [20]
 
 — in which district judges have issued such orders,
 
 see, e.g., United States v. Johnpoll,
 
 No. 83 Cr. 82 (S.D.N.Y. June 29, 1983),
 
 aff'd on other grounds,
 
 739 F.2d 702 (2d Cir.),
 
 cert. denied,
 
 — U.S. -, 105 S.Ct. 982, 83 L.Ed.2d 983 (1984);
 
 United States v. Meros,
 
 613 F.Supp. 18 (M.D.Fla.1984);
 
 United States v. Carver,
 
 No. 81-342 (D.D.C.Nov. 10, 1981), we have discovered only one case in which the propriety of the order has been examined.
 
 See Garpeg, supra,
 
 583 F.Supp. at 797-99, (denying motion for preliminary injunction). Indeed, in
 
 Johnpoll,
 
 this Court did not discuss the issue although it was squarely presented.
 
 See
 
 Brief for Appellant at 13-15 and Brief for Appellee at 29 n.*, 739 F.2d 702.
 

 It is clear that the District Court could have ordered Davis to cease his Cayman Islands litigation on two separate grounds. First, it is well established that a United States court has the power to prescribe law governing the conduct of its nationals even when the conduct takes place outside the United States.
 
 See, e.g., Blackmer v. United States,
 
 284 U.S. 421, 436-38, 52 S.Ct. 252, 254-55, 76 L.Ed.2d 375 (1932);
 
 Laker Airways, Inc. v. Sabena,
 
 731 F.2d 909, 922 (D.C.Cir.1984). Davis, a United States citizen, was clearly subject to that power. Second, a United States Court also has jurisdiction to prescribe laws concerning conduct outside of the territorial boundaries of the United States which has or is intended to have a substantial effect within the United States.
 
 See In re Marc Rich & Co., A.G.,
 
 707 F.2d 663, 666 (2d Cir.),
 
 cert. denied,
 
 463 U.S. 1215, 103 S.Ct. 3555, 77 L.Ed.2d 1400 (1983);
 
 Laker, supra,
 
 731 F.2d at 921-22;
 
 Restatement (Revised)
 
 § 402(l)(c) (Tent. Draft No. 2, 1981). The action which was enjoined — continued litigation in the Cayman Islands directed at preventing the bank from complying in a timely fashion with the subpoena of the District Court — was designed to interfere with a pending criminal prosecution in the United States.
 

 The jurisdiction of the District Court was, however, not exclusive; the Government of the Cayman Islands also had jurisdiction to prescribe law governing Davis’ conduct in the Cayman Islands. Under Cayman law, Davis had the right to oppose the bank’s efforts to secure a Cayman court order permitting the disclosure of the subpoenaed records. Because the United States and the Cayman Islands had concurrent jurisdiction to prescribe, we must determine whether, having due regard to principles of international comity, the District Court properly exercised its power.
 
 [21]
 

 The
 
 Restatement (Revised)
 
 § 403 (Tent. Draft No. 2 1981) suggests a number of
 
 *1037
 
 factors that should be analyzed in evaluating whether a court can regulate the conduct of a person having contacts with another state.
 
 [22]
 
 Using these factors, we hold that in the instant case the District Court properly ordered Davis to cease his Cayman litigation.
 

 First, Davis’ lawsuits in Cayman had a direct, substantial and forseeable effect on the United States. The Bank records which the government sought were an important part of the ease against Davis, and Davis’ Cayman litigation was instituted and pursued with the express purpose of preventing these documents from being introduced at trial.
 

 Second, Davis had close links with the United States; he was both a citizen and a resident of this country.
 

 Third, as discussed above, the United States had a strong national interest in safeguarding the integrity of its criminal process. In recent years Congress has become increasingly concerned with the use of offshore banks to launder the proceeds of criminal activities and to evade taxes.
 
 See
 
 H.Rep. No. 98-907, 98th Cong.2d Sess. (1984). This concern manifested itself in the enactment, as part of the Comprehensive Crime Control Act of 1984, of legislation designed to make foreign-kept business records more readily available and admissible into evidence in criminal trials in the United States.
 
 [23]
 
 18 U.S.C. §§ 3161, 3292, 3505-07. 18 U.S.C. § 3506(b), which requires that all parties to a criminal case in the United States serve upon the Department of Justice any pleadings or documents filed in a foreign country in opposi
 
 *1038
 
 tion to an official request by the United States for evidence located in that country, stemmed from dissatisfaction with the delays caused by criminal defendants’ use of foreign procedures to block compliance with prosecutors’ requests for records.
 
 [24]
 
 H.Rep. No. 98-907, 98th Cong., 2d Sess. 2 (1984); 12 Cong.Rec. H8023-26 (statements of Rep. Conyers and Rodino).
 

 Fourth, Davis had no justified expectation in the privacy of his bank records. The Fourth Amendment does npt protect against the disclosure of bank records located in the United States.
 
 United States v. Miller,
 
 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). Moreover, given the plethora of exceptions in the Cayman bank secrecy laws, see discussion above at 4296;
 
 Nova Scotia II, supra,
 
 740 F.2d at 827 n. 15, the Cayman bank secrecy laws create no expectation of privacy not present in
 
 Miller. See United States v. Payner,
 
 447 U.S. 727, 732 n. 4, 100 S.Ct. 2439, 2444 n. 4, 65 L.Ed.2d 468 (1980).
 

 Finally, even though the Cayman Islands' did not have a strong national interest in blocking the disclosure of Davis’ bank records, see discussion above at 4296, like all sovereign states it did have a substantial interest in regulating the progress of litigation in its own courts. Thus, while it is well-settled that a federal court has the power to enjoin a party before it from pursuing litigation before a foreign tribunal,
 
 see, e.g., Laker, supra,
 
 731 F.2d 909 (D.C.Cir.1984);
 
 Seattle Totems Hockey Club v. National Hockey League,
 
 652 F.2d 852, 855 and n. 5 (9th Cir.1981),
 
 cert. denied,
 
 457 U.S. 1105, 102 S.Ct. 2902, 73 L.Ed.2d 1313 (1982);
 
 Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc.,
 
 412 F.2d 577 (1st Cir.1969);
 
 Harvey Aluminum, Inc. v. American Cyanamid Co.,
 
 203 F.2d 105 (2d Cir.),
 
 cert. denied,
 
 345 U.S. 964, 73 S.Ct. 949, 97 L.Ed. 1383 (1953),
 
 on remand,
 
 15 F.R.D. 14 (S.D.N.Y.1953) (Weinfeld, J.);
 
 Medtronic, Inc. v. Catalyst Research Corp.,
 
 518 F.Supp. 946 (D.Minn.),
 
 aff'd,
 
 664 F.2d 660 (8th Cir.1981);
 
 [25]
 

 cf. Cole v. Cunningham,
 
 133
 
 U.S.
 
 107, 121, 10 S.Ct. 269, 273, 33 L.Ed.2d 538 (1890) (upholding state court decree restraining citizen of that state from prosecuting attachment suits begun in another state), such an order often effectively restricts the jurisdiction of the foreign tribunal and should therefore be used sparingly.
 
 See Laker Airways, supra,
 
 731 F.2d at 927;
 
 Seattle Totems, supra,
 
 652 F.2d at 855;
 
 Compagnie Des Bauxites de Guinee v. Insurance Company of North America,
 
 651 F.2d 877, 887 (3d Cir.1981),
 
 cert. denied,
 
 457 U.S. 1105, 102 S.Ct. 2902, 73 L.Ed.2d 1312 (1982);
 
 Canadian Filters, supra,
 
 412 F.2d at 578;
 
 Garpeg, supra,
 
 583 F.Supp. at 798. Indeed, because an order enjoining a litigant from continuing a foreign action is facially obstructive, international comity demands that this extraordinary remedy be used only after other means of redressing the injury sought to be avoided have been explored.
 
 Laker, supra,
 
 731 F.2d at 933 n. 81.
 

 Here it is undisputed that the Government had been seeking the Cayman bank records at least since March 22, 1983 — six months prior to the return of the indictment. Demonstrating a strong desire not to intrude upon Cayman sovereignty, the Government had attempted to secure Davis’ records through approaches to both the office of the Governor and the Attorney General of the Cayman Islands. Until Judge Conner issued his June 14, 1984 order, however, Davis had successfully blocked the production of the bank records.
 

 In
 
 Laker, supra,
 
 731 F.2d 909, the D.C. Circuit, in a scholarly opinion by Judge Wilkey, affirmed an order granting a British plaintiff’s motion for a preliminary in
 
 *1039
 
 junction restraining four American defendants from taking any action before a foreign court that would interfere with the District Court’s jurisdiction over the civil antitrust suit before it. Two British defendants had already obtained an injunction from the English Court of Appeal restraining plaintiff from prosecuting its United States action and plaintiff feared that the American defendants would seek similar relief. The Court noted that the sole purpose of the English litigation was to terminate the action, and held that the District Court had the authority to protect its own ability to render a just and final judgment by issuing the injunction. Similarly, here the sole purpose of Davis’ Cayman litigation was to block compliance with a legitimate trial subpoena. Had Davis not been ordered to terminate the Cayman litigation, the trial would have proceeded without necessary and highly relevant evidence. Under these circumstances, the District Court’s order was a permissible exercise of authority necessary to insure a complete adjudication of the matter before it.
 
 Cf. In re Martin-Trigona,
 
 737 F.2d 1254, 1261 (2d Cir.1984) (“federal courts have both the inherent power and the constitutional obligation to protect their jurisdiction from conduct which impairs their ability to carry out Article III functions.”).
 

 Balancing all these factors, we conclude that in this case, the District Court properly ordered Davis to terminate his Cayman litigation. We feel constrained, however, to repeat that such an order is an extraordinary remedy which may be used only in very limited circumstances — and only after other means of obtaining the records have been explored.
 
 [26]
 

 C.
 
 The Fifth Amendment Claim
 

 Davis claims that the District Court’s order requiring him to direct the Cayman Bank to disclose his bank records violated his Fifth Amendment right against self-incrimination. This claim is not persuasive.
 

 It is well settled that the Fifth Amendment “does not independently proscribe the compelled production of every sort of incriminating evidence but applies only when the accused is compelled to make a testimonial communication that is incriminating.”
 
 Fisher v. United States,
 
 425 U.S. 391, 408, 96 S.Ct. 1569, 1579, 48 L.Ed.2d 39 (1976). In the instant case, the District Court ordered Davis to direct the Bank — a third party — to produce the incriminating documents. Since the only communication which Davis himself was compelled to make was the direction to the bank, that direction is the only possible source of a Fifth Amendment violation.
 
 See Fisher, supra
 
 at 409, 96 S.Ct. at 1580. In
 
 Fisher,
 
 the Supreme Court held that the Fifth Amendment was not violated when the District Court ordered a taxpayer to produce an accountant’s workpapers. The Court reasoned that since the workpapers were not prepared by the taxpayer and contained no testimonial declaration by him, the taxpayer could not be said to have been compelled to make any testimonial communications. In addition, since the preparation of the workpapers was wholly voluntary, there was no “compelled” testimonial evidence.
 
 Id.
 
 at 409-10, 96 S.Ct. at 1580.
 
 See also United States v. Doe,
 
 465 U.S. 605, -, 104 S.Ct. 1237, 1241, 79 L.Ed.2d 552, 559 (1984). The reasoning of
 
 Fisher
 
 applies here. The bank records were prepared by the bank and contained no testimonial communications by Davis. Further, the Bank voluntarily prepared these business records and thus no compulsion was present.
 
 See Doe, supra,
 
 104 S.Ct. at 1241-42.
 

 
 *1040
 
 Even though the contents of the bank records were not privileged, Davis’ direction authorizing the disclosure of the records might have had communicative aspects of its own.
 
 See Doe, supra,
 
 104 S.Ct. 1237;
 
 Fisher, supra,
 
 425 U.S. at 410, 96 S.Ct. at 1580;
 
 In re Grand Jury Subpoena Duces Tecum,
 
 722 F.2d 981, 985 (2d Cir.1983);
 
 United States v. Ghidoni, supra,
 
 732 F.2d at 818-19. However, Judge Conner’s carefully crafted order specifically provided that the Government could not use the directive as an admission that the bank accounts existed, that Davis had control over them, or for any other purpose. These limitations on the use of the direction obviate any claim of testimonial compulsion.
 
 See Ghidoni, supra.
 

 III.
 
 The Bankruptcy Fraud Count
 

 Finally, Davis argues that there was insufficient evidence to support his conviction for bankruptcy fraud. Completely misapprehending the theory under which the Government prosecuted him for bankruptcy fraud, Davis argues that there was no testimony at trial supporting the proposition that his payment of bribes to the General Dynamics officials over a period of years were made in contemplation of bankruptcy — a point which the Government does not dispute. But the scenario at trial was quite different from that which appellant describes. The bankruptcy fraud count charged Davis with having knowingly and fraudulently transferred and concealed and aided and abetted the transfer and concealment of, Frigitemp property in contemplation of a case under Title 11 U.S.C. (“the Bankruptcy Act”) and with intent to defeat the provisions of Title 11.
 

 Specifically, the bankruptcy fraud charge was based on two separate instances of transfer and concealment of Frigitemp’s assets apart from the bribes paid to the General Dynamics officials. First, the evidence demonstrated what Judge Conner described as the “sweetheart” deal by which Intersystems Design and Technology Corporation (“IDT”) — a new company formed and controlled by Davis — assumed all of General Dynamics’ contracts with Frigi-temp. By that time, their contracts constituted the only profitable contracts in Frigi-temp’s inventory. This assignment, made to IDT at no cost whatsoever, was accomplished on February 9, 1978, less than six weeks before Frigitemp filed for reorganization under Chapter 11, and at a time when it was clear to all concerned that the actual bankruptcy of Frigitemp was imminent. The profit remaining in the contracts was no mere speculation. Davis actually obtained over $10 million in profits from his assumption of the General Dynamics contracts, profits which should have benefited the Frigitemp estate either through continued performance under reorganization, or through outright sale to an outside contractor. Second, the evidence demonstrated that beginning in November 1974 Davis managed a series of embezzlements from Frigitemp totalling over $2 million.
 

 In evaluating a claim that the evidence was insufficient to support a conviction, the “verdict of the jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it.”
 
 Glasser v. United States,
 
 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942);
 
 United States v. Ginsberg, 758
 
 F.2d 823, 824 (2d Cir.1985). If
 
 “any
 
 rational trier of fact could have found the essential elements of the crime,” we must affirm the conviction.
 
 See Jackson v. Virginia,
 
 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). This is a “very heavy burden",
 
 United States v. Soto,
 
 716 F.2d 989, 991 (2d Cir.1983).
 

 Reviewing the record under this standard, it is amply clear that the evidence was sufficient to support a determination that Davis committed bankruptcy fraud by transferring to his own company the highly profitable General Dynamics contracts.
 
 See United States v. Dioguardi,
 
 428 F.2d 1033, 1036 (2d Cir.),
 
 cert. denied,
 
 400 U.S. 825, 91 S.Ct. 50, 27 L.Ed.2d 54 (1970) (Friendly, J.).
 

 However, with respect to Davis’ embez-zlements it is not sufficiently clear, based on the record as a whole, that they were committed in contemplation of bankruptcy.
 
 *1041
 
 Davis’ numerous peculations occurred over a period of several years, commencing well before Frigitemp’s financial difficulties became apparent. Moreover, in light of the government’s concession that the bribes which Davis paid to Veliotas and Gilliland were not made in contemplation of bankruptcy, it is difficult to understand how Davis’ diversion of a portion of the intended bribe money into his own accounts could have been made in contemplation of bankruptcy. We therefore affirm the conviction on Count 14 solely on the ground that the evidence adduced at trial was sufficient to demonstrate that Davis’ assumption of the General Dynamics contracts constituted a violation of the Bankruptcy Act.
 

 For the foregoing reasons we affirm the judgment of conviction on all counts.
 

 [2]
 

 . Gilliland was recently ordered extradited from Ireland. Veliotis remains a fugitive in Greece.
 

 [3]
 

 . Switzerland was the first nation with which the United States entered into a bilateral mutual assistance treaty. Since that time, the United States has concluded agreements for exchange of information in criminal matters with the Netherlands (T.I.A.S. No. 10734) and Turkey (T.I.A.S. No. 10619), and is negotiating similar agreements with several other states.
 
 See Restatement of the Foreign Relations Law of the United States (Revised) ("Restatement Revised")
 
 § 486, Introductory Note (Tent. Draft No. 5 1984).
 

 [4]
 

 .Similar steps were taken with respect to obtaining records of the accounts in Lausanne of Gilliland and Veliotis at the Union Bank of Switzerland to which the kickback payments were remitted by Davis. No issue has been raised, however, with respect to them.
 

 [5]
 

 .Article 18 of the Treaty deals with "Business Records”, and provides:
 

 1. If the production of a document, including a book, paper, statement, record, account or writing, or extract therefrom, other than an official document provided for in Article 19, of whatever character and in whatever form is requested, the official executing the request shall, upon specific request of the requesting State, require the production of such document pursuant to a procedural document. The official shall interrogate under oath or affirmation the person producing such document and examine it in order to determine if it is genuine and if it was made as a memorandum or record of an act, transaction, occurrence, or event, if it was made in the regular course of business and if it was the regular course of such business to make such document at the time of the act, transaction, occurrence or event recorded therein or within a reasonable time thereafter.
 

 2. The official shall cause a record of testimony taken to be prepared and shall annex it to the document.
 

 3. If the official is satisfied as to the matters set forth in paragraph 1, he shall certify as to the procedure followed and his determinations and shall authenticate by his attestation the document, or a copy thereof or extract therefrom, and the record of the testimony taken. Such certification and attestation shall be signed by the official and state his official position. The seal of the authority executing the request shall be affixed.
 

 4. Any person subsequently transmitting the authenticated document shall certify as to the genuineness of the signature and the official position of the attesting person or, if there are any prior certifications, of the last certifying person. The final certification may be made by:
 

 a. an official of the Central Authority of the requested State;
 

 b. a diplomatic or consular official of the requesting State stationed in the requested State; or
 

 c. a diplomatic or consular official of the requested State stationed in the requesting State.
 

 5. Where a request under this Article pertains to a pending court proceeding, the defendant, upon his application, may be present or represented by counsel or both, and may examine the person producing the document as to its genuineness and admissibility. In the event the defendant elects to be present or represented, a representative of the requesting State or a state or canton thereof may also be present and put such questions to the witness.
 

 6. Any document, copy thereof, entry therein or extract therefrom authenticated in accordance with this Article, and not otherwise inadmissible, shall be admissible as evidence of the act, transaction, occurrence or event in any court in the requesting State without any additional foundation or authentication.
 

 7. In the event that the genuineness of any document authenticated in accordance with this Article is denied by any party to a proceeding, he shall have the burden of establishing to the satisfaction of the court before which the proceeding is pending that such document is not genuine in order for the document to be excluded from evidence on such ground.
 

 [6]
 

 . The record does not reveal from whom Davis' attorney learned of the document request. It seems clear, however, that the United States Government was not the source of this information.
 

 [7]
 

 . The protest was denied by the Swiss Federal Tribunal in December 1982.
 

 [8]
 

 . The term "defendant” includes a "suspect who is a subject of investigation." Art. 40, ¶ 8, 27 U.S.T. at 2062. The government has not argued that Davis was not a "defendant” within the meaning of Article 18, ¶ 5.
 

 [9]
 

 . Of course, a treaty may confer judicially enforceable rights on individuals if the signatory states so desire.
 
 See, e.g., Cardenas, supra,
 
 733 F.2d at 918;
 
 Diggs v. Richardson,
 
 555 F.2d 848 (D.C.Cir.1976) (Leventhal, J.);
 
 Restatement (Revised)
 
 § 907 comment a (Tent. Draft No. 5 1984).
 

 [10]
 

 . Upon receipt of a request for assistance,
 
 the requested State
 
 shall notify:
 

 a. any person from whom a statement or testimony or documents, records, or articles of evidence are sought;
 

 b. any suspect or defendant in a criminal investigation or proceeding in the requesting State who resides in the requested State if the municipal law in the requesting State general
 
 *1031
 
 ly or for admissibility of evidence so requires, and that State so requests; and
 

 c. Any defendant in a criminal proceeding in the requesting State, where the law in the requested State requires such notice. (Emphasis added.) 27 U.S.T. at 2056.
 

 [11]
 

 . It is not incumbent upon us to decide whether Switzerland was required to give Davis notice under Article 36, subd. c.
 

 [12]
 

 .
 
 See, e.g., Message of President Ford,
 
 122 Cong.Rec. S3600 (daily ed. Feb. 18, 1976) ("Despite the general cooperation of the Swiss authorities in criminal cases, the procedures for obtaining needed information have been generally ponderous and inadequate.”)
 

 [13]
 

 . Though, "the trial court must, despite the fact that it may have already determined that the extra-judicial statement falls within an exception to the hearsay rule, specifically determine, prior to deciding whether to admit the statement, that its introduction would not violate the confrontation clause.”
 
 United States v. Oates,
 
 560 F.2d 45, 81 (2d Cir.1977).
 
 See also
 
 Fed.R.Evid. 803, Advisory Committee Notes. Likewise, the mere fact that evidence is obtained in accordance with the provisions of a treaty does not immunize it from a Sixth Amendment challenge.
 

 [14]
 

 . The Cayman Confidential Relationships [Preservation] Law (Law 16 of 1976), as amended (Law 26 of 1979), states in relevant part:
 

 3. (2) This law has no application to the seeking, divulging, or obtaining, of confidential information—
 

 (a) in compliance with the directions of the Grand Court pursuant to section 3A;
 

 (b) by or to—
 

 (1) any professional person acting in the normal course of business or with the consent, express or implied, of the relevant principal; 3A. (1) Whenever a person intends or is required to give in evidence in, or in connection with, any proceeding being tried, inquired into or determined by any court, tribunal or other authority (whether within or without the Islands) any confidential information within the meaning of this Law, he shall before so doing apply for directions and any adjournment necessary for that purpose may be granted.
 

 (2) Application for directions under subsection (1) shall be made to, and be heard and determined by, a Judge of the Grand Court sitting alone and in camera. At least seven days’ notice of any such application shall be given to the Attorney General and, if the Judge so orders, to any person in the Islands who is a party to the proceedings in question. The Attorney General may appear as amicus curiae at the hearing of any such application and any party on whom notice has been served as aforesaid shall be entitled to be heard thereon, either personally or by counsel.
 

 4. (1) Subject to the provisions of sub-section (2) of section 3, whoever—
 

 (a) being in possession of confidential information however obtained;
 

 (i) divulges it; or
 

 (ii) attempts, offers or threatens to divulge it to any person not entitled to possession thereof; ... is guilty of an offence [sic] and liable on summary conviction to a fine not exceeding $5,000 or to imprisonment for a term not exceeding 2 years or both.
 

 [15]
 

 . The Government characterizes the Bank as a "willing third party witness”. While it is technically correct that the bank was "willing" in the sense that it did not file a motion to quash the trial subpoena, we note that the Bank’s amenability to disclosure may have resulted from a fully justified fear of sanctions. On February 28, 1984, the U.S. District Court for the Southern District of Florida, in an unrelated case, filed an order imposing a $1,825,000 fine on the Bank for failing to comply with a grand jury subpoena
 
 duces tecum
 
 calling for the production of documents located in the Cayman Islands.
 
 See In re Grand Jury Proceedings Bank of Nova Scotia (“Nova Scotia II”),
 
 740 F.2d 817 (11th Cir.1984),
 
 cert. denied,
 
 — U.S. -, 105 S.Ct. 778, 83 L.Ed.2d 774 (1985).
 

 [16]
 

 . In the
 
 Restatement (Revised),
 
 Tent.Draft No. 3 (1982), § 40 has been replaced by § 420, which provides:
 

 Requests for Disclosure and Foreign Government Compulsion: Law of the United States
 

 (l)(a) Where authorized by statute or rule of court, a court in the United States may order a person subject to its jurisdiction to produce documents, objects, or other information directly relevant, necessary, and material to an action or investigation, even if the information or the person in possession of the information is outside the United States.
 

 (b) Failure to comply with an order to produce information may subject the person to whom the order is directed to sanctions, including finding of contempt, dismissal of a claim or defense or default judgment, or may lead to an determination by the court that the facts to which the order was addressed are as asserted by the opposing party.
 

 (c) In issuing an order directing production of information located abroad, a court of the United States should take into account the importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the extent to which compliance with the request would undermine important interests of the state where the information is located; and the possibility of alternative means of securing the information.
 

 (2) If disclosure of information located outside the United States is prohibited by a law, regulation or court order of the state in which the information or prospective witness is located, or by the state or nationality of the prospective witness,
 

 (a) the person to whom the order is directed may be required by the court to make a good faith effort to secure permission from the foreign authorities to make the information available;
 

 (b) the court should not ordinarily impose the sanctions of contempt, dismissal, or default on the party that has failed to comply with the order for production except in cases of deliberate concealment or removal of information or of failure to make a good faith effort in accordance with paragraph (a);
 

 (c) the court may, in appropriate cases, make findings of fact adverse to a party that has failed to comply with the order for production, even if the party has made a good faith effort to secure permission from the foreign authorities to make the information available and that effort has been unsuccessful.
 

 [17]
 

 . In this context it is important to note that the Cayman Islands have provided for bank secrecy in their criminal statutes.
 
 See Chase Manhattan Bank, supra,
 
 584 F.Supp. at 1086.
 
 Cf. First National City Bank, supra,
 
 396 F.2d at 903-04.
 

 [18]
 

 .
 
 See
 
 31 U.S.C. § 5314; 31 C.F.R. § 103.24 (1984);
 
 United States v. Payner,
 
 447 U.S. 727, 732 and n. 4, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980);
 
 Nova Scotia II, supra,
 
 740 F.2d at 828;
 
 United States v. Ghidoni,
 
 732 F.2d814(11th Cir.),
 
 cert. denied,
 
 — U.S. -, 105 S.Ct. 328, 83 L.Ed.2d 264 (1984).
 

 [19]
 

 .The Government has represented that the Bank records were produced pursuant to a Cayman Court order and that the consent form was not sent to the Bank until the conclusion of the trial. However, because the record contains neither a citation to nor a copy of the Cayman court order authorizing disclosure, and because the Government has not provided a copy of the order requested by the Court at oral argument, we have felt constrained to discuss the propriety of the order compelling Davis to consent to the release of the bank records.
 

 [20]
 

 . In addition to Judge Conner’s order, on January 13, 1983 Judge Broderick issued an order requiring Davis to take all steps necessary to insure the release of certain documents from Canada.
 

 [21]
 

 . At this point, we should note that the District Court’s order did not require Davis to do an act
 
 *1037
 
 in another state that is prohibited by the law of that state; nor did the order require Davis to refrain from doing an act in another state that is required by the law of that state.
 
 See Restatement (Revised)
 
 § 419 (Tent. Draft No. 3 1982). Depending upon how we characterize the order below, Davis was either ordered to refrain from taking actions which he was permitted to take under Cayman law, or ordered to take actions which he was not prohibited from taking under Cayman law.
 

 [22]
 

 . Limitations on Jurisdiction to Prescribe:
 

 (1) Although one of the bases for jurisdiction under § 402 is present, a state may not apply law to the conduct, relations, status or interests of persons or things having connections with another state or states when the exercise of such jurisdiction is unreasonable.
 

 (2) Whether the exercise of jurisdiction is unreasonable is judged by evaluating all the relevant factors, including:
 

 (a) the extent to which the activity (i) takes place within the regulating state, or (ii) has substantial, direct, and foreseeable effect upon or in the regulating state;
 

 (b) the links, such as nationality, residence, or economic activity, between the regulating state and the persons principally responsible for the activity to be regulated, or between that state and those whom the law or regulation is designed to protect;
 

 (c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;
 

 (d) the existence of justified expectations that might be protected or hurt by the regulation in question;
 

 (e) the importance of regulation to the international political, legal or economic system;
 

 (f) the extent to which such regulation is consistent with the traditions of the international system;
 

 (g) the extent to which another state may have an interest in regulating the activity;
 

 (h) the likelihood of conflict with regulation by other states.
 

 (3) An exercise of jurisdiction which is not unreasonable according to the criteria indicated in Subsection (2) may nevertheless be unreasonable if it requires a person to take action that would violate a regulation of another state which is not unreasonable under those criteria. Preference between conflicting exercises of jurisdiction is determined by evaluating the respective interests of the regulating states in light of the factors listed in Subsection (2).
 

 (4) Under the law of the United States:
 

 (a) a statute, regulation or rule is to be construed as exercising jurisdiction and applying law only to the extent permissible under § 402 and this section, unless such construction is not fairly possible; but
 

 (b) where Congress has made clear its purpose to exercise jurisdiction which may be beyond the limits permitted by international law, such exercise of jurisdiction, if within the constitutional authority of Congress, is effective as law in the United States.
 

 [23]
 

 . This legislation became effective on November 12, 1984 — after the order in this case had been complied with.
 

 [24]
 

 . We note that Congress did not pass legislation authorizing the federal courts to enjoin criminal defendants from seeking to block compliance with a legitimate record request. We believe it fair to assume that this was not an oversight but a recognition that Federal Courts had exercised this authority and needed no legislative support.
 

 [25]
 

 . This issue has arisen most frequently in civil rather than criminal cases. Though the civil cases pose very different issues, they nonetheless offer some interesting insights.
 

 [26]
 

 . In this context, we note that the recent passage of legislation intended to facilitate the use of business records located abroad at U.S. criminal trials will greatly reduce the need for such an order. For example, under 18 U.S.C. § 3292 and amendments to 18 U.S.C. § 213, a federal court, upon application of the prosecutor, may suspend the running of the statute of limitation for such time (up to three years) as is necessary to obtain evidence from a foreign country. Similarly, under an amendment to 18 U.S.C. § 3161(h), a federal court may exclude from Speedy Trial Act deadlines any period of time (up to one year) in order to allow a party to a criminal case to obtain evidence located in a foreign country.