**In re N.D.N.Y. GRAND JURY SUBPOENA # 86–0351–S.**

UNITED STATES of America, Appellee,

v.

**A GRAND JURY WITNESS, Appellant.**

**No. 813, Docket 86–6264.**

United States Court of Appeals, Second Circuit.

Argued Jan. 23, 1987.

Decided Feb. 4, 1987.

Harold J. Boreanaz, Buffalo (Boreanaz, Baker & Humann, of Counsel), for appellant.

Paula Ryan Conan, Asst. U.S. Atty., N.D.N.Y., Syracuse (Frederick J. Scullin, Jr., U.S. Atty., N.D.N.Y., of counsel), for appellee.

Before: LUMBARD, KEARSE, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Lee Alexander challenges on various grounds the judgment of the United States District Court for the Northern District of New York, Thomas J. McAvoy, *Judge*, holding him in contempt for failure to comply with the court's order to sign a "Consent Directive" designed to allow the government access to records of alleged transactions by Alexander with foreign financial institutions. We recognize that so-called "off-shore" and other foreign banking institutions present frustrating roadblocks to the government's efforts to enforce our tax and criminal laws, and we sympathize with the government's desire to develop an effective vehicle for limiting the utility of such accounts for illegally sheltering income. Nevertheless, we sense that there are boundaries to appropriate judicial involvement in these activities, and, because we believe the district court contravened sound judicial policy in this instance, we reverse.

## BACKGROUND

Entrusted for sixteen years with serving the public interest as the mayor of Syracuse, New York, Lee Alexander currently stands suspected of improperly using his office to receive kickbacks and other extortionate payments. The alleged scheme involves the use of foreign financial institutions to shield those payments from discovery by domestic authorities. As the target of an ongoing grand jury investigation into these allegations, Alexander was served with a subpoena *duces tecum* commanding him to appear before the grand jury with a signed copy of a "Consent Directive" drafted by the United States Attorney for the Northern District of New York. The text of that document provided, in essence, that Alexander authorized any financial institution at which he had an account to disclose that information, including copies of all documents with certificates of authenticity, to any agent or employee of the United States government. The Assistant United States Attorney responsible for presenting this matter to the grand jury frankly stated that the "subpoena is being issued to facilitate the grand jury's securing information from certain foreign financial institutions in which [Alexander] deposited assets which are believed to be proceeds of the extortion/kickback scheme now under investigation".

Alexander moved to quash the subpoena and the district court heard argument by the parties. Apart from a concession by the government to limit the applicability of the document to only *foreign* financial institutions, the district court denied the motion and ordered Alexander to comply with the subpoena. Including that one amendment, the consent directive at issue on this appeal provides:

I, LEE ALEXANDER, of the State of New York in the United States of America, do hereby authorize and direct any bank, trust company, or other financial institution located outside of the territorial United States at which I have or have had an account of any kind, or at which any corporation has or has had an account of any kind upon which I am or have been authorized to draw, to disclose all information and deliver copies of all documents of every nature in the possession or control of such bank, trust company, or other financial institution which relate to any such accounts, together with a certificate attesting to the authenticity of any and all such documents, to any agent or employee of the United States Government who presents a copy of this Consent Directive which has been certified by the Clerk of the United States District Court for the Northern District of New York to such bank, trust company, or other financial institution, and this Consent Directive shall be irrevocable authority for doing so.

This authorization is intended to apply to any and all bank confidentiality laws of any state or nation, and shall be construed as consent with respect thereto as the same may apply to any accounts for which I may

be or have been a relevant principal, signatory or beneficiary.

---

Lee Alexander

Appellant's appendix at A–27.

Alexander appeared before the grand jury, as directed, on December 3, 1986, and executed the "Consent Directive", but only after adding the phrase "[e]xecuted under protest" above the signature line. Confronted with Alexander's refusal to sign without that cautionary language, the government moved the district court to hold him in contempt.

At a hearing before the district court that same day, Alexander's counsel argued that his client's execution "under protest" complied with the court's order because it in no way modified the "Consent Directive". Rather, he suggested that the added language did nothing more than ensure that the document was not a false document:

> What this man simply said is that he would not sign something that was false. And if he signed it, without appending those words, it would be false because it speaks in terms of consent which is not his consent, he simply puts on here that fact that it is executed under protest.

Appellant's appendix at A–95. Persuaded by the government, however, that the added language might affect the validity of the "Consent Directive" in the eyes of foreign financial institutions and might, therefore, impede the grand jury's investigation, the district judge concluded that Alexander had not complied with his earlier order and had not established good cause for his refusal to sign. Therefore, the judge directed Alexander to sign the document without any limiting language. In addition, the district court denied Alexander's request to have the document itself reflect that it was signed pursuant to the court's order. Upon Alexander's refusal to comply, the district judge held him in contempt under 28 U.S.C. § 1826(a) and ordered him committed to the custody of the United States Marshal for the Northern District of New York.

In light of the expedited appeal to this court from the judgment of contempt, *see United States v. Ryan*, 402 U.S. 530, 532–33, 91 S.Ct. 1580, 1581–82, 29 L.Ed.2d 85 (1971), and upon the conditions that he turn over his passport, not travel outside the continental United States, and not act to frustrate the grand jury's investigation, Alexander's commitment was stayed by the district court until "February 2, 1987 or until the appeal is determined, whichever occurs first". For the reasons discussed above, we reverse the judgment of contempt.

## DISCUSSION

Alexander presents four challenges to the "Consent Directive" on this appeal. Specifically, he protests, first, that executing the directive would violate his fifth amendment right against self-incrimination; second, that he is being forced to sign a false document because it does not provide that his consent was coerced; third, that he properly refused to respond before the grand jury because he had been subjected to illegal electronic surveillance; and, lastly, that the form of consent is deficient because it authorizes disclosure to any employee of the government in contravention of the general rule on grand jury secrecy codified in Fed.R.Crim.P. 6(e).

The Supreme Court has made "clear that the Fifth Amendment does not independently proscribe the compelled production of every sort of incriminating evidence but applies only when the accused is compelled to make a *testimonial* communication that is incriminating." *Fisher v. United States*, 425 U.S. 391, 408, 96 S.Ct. 1569, 1579, 48 L.Ed.2d 39 (1976) (emphasis in original). Thus, to establish a fifth amendment violation, Alexander must demonstrate all three elements, namely, compulsion, a testimonial communication, and the incriminating nature of that communication. *See United States v. Browne*, 624 F.Supp. 245, 248 (N.D.N.Y.1985).

We recognize that in a factually similar setting, we upheld an order to sign a con-

sent directive against a fifth amendment challenge on the ground that "[t]he bank records were prepared by the bank and contained no testimonial communications by [the target of the investigation]. Further, the Bank voluntarily prepared these business records and thus no compulsion was present." *United States v. Davis*, 767 F.2d 1025, 1039 (2d Cir.1985). We likewise rejected a claim in *Davis* that the directive itself had testimonial aspects because the district court's "order specifically provided that the Government could not use the directive as an admission that the bank accounts existed, that Davis had control over them, or for any other purpose." *Id.* at 1040; *see also United States v. Ghidoni*, 732 F.2d 814, 818 (11th Cir.), *cert. denied*, 469 U.S. 932, 105 S.Ct. 328, 83 L.Ed.2d 264 (1984).

Although the directive in this case does not expressly provide that it may not be used as an admission by Alexander for any purpose, it seems clear that the government could not so use it consistently with Alexander's fifth amendment rights. *See Davis*, 767 F.2d at 1040. Moreover, like the directive in *Ghidoni*, where the existence of and control over alleged accounts was also in dispute, the instant directive employs language that requires disclosure only *if* the bank has such accounts. *See* 732 F.2d at 818; *see also Browne*, 624 F.Supp. at 248. Thus, because executing this directive would not implicate any testimonial communication, we conclude that this directive does not impair Alexander's rights under the fifth amendment.

Far more disconcerting, though, is Alexander's contention that he is being forced at the direction of the district court to sign a patently false document. He argues that, without some express statement that his consent has not been voluntarily given, the document is fraudulent on its face. The eleventh circuit addressed a similar argument in *Ghidoni*. There, the appellant claimed "that his signing the consent directive would constitute a due process violation by forcing him to make a false communication. He assert[ed] that his sig-

nature, evincing consent to the bank's disclosure, would be a sworn misstatement because he does not consent to disclosure." *Ghidoni*, 732 F.2d at 818 n. 7. The court summarily rejected that claim because the directive at issue there expressly provided that "[t]his direction has been executed pursuant to that certain order of the United States District Court for the Northern District of Florida". *Id.* at 815 n. 1.

Here, however, the directive contains no such statement. Indeed, the government opposed Alexander's request to the district court to include such express language, arguing that the record clearly noted that Alexander's consent was not freely given, Appellant's appendix at A–99 to 100, and that it represented nothing more than a back door effort to warn the banks not to comply, *id.* at A–102. On appeal, the government argued that the directive is not false because it nowhere purports to be freely executed, but, instead, simply directs that it "be construed as consent". Moreover, at oral argument before this court, the government stated that it would likely pursue an obstruction of justice prosecution if Alexander were to sign the directive and, assuming the existence of such accounts, separately request the foreign banks not to comply because his consent had not freely been given. Thus, the government plainly admits that it wants a statement of consent—fully aware that the consent is involuntarily provided—without including any indication that the consent is given under duress. The district court accepted the government's position that a notation to the effect that the consent was court ordered might impede the grand jury's investigation, and therefore ordered Alexander to sign the directive unchanged.

We are of the view that it was improper to bring the considerable sanction of contempt to bear as part of a procedure which would conceal the true nature of the purported "Consent Directive". While we have noted that enforcement of this directive does not rise to a constitutional violation, it nevertheless offends basic precepts of honest behavior by invoking the

district court's imprimatur on a document that would be misleading. Our supervisory power permits us "to review proceedings of trial courts and to reverse judgments of such courts which the appellate court concludes were wrong." *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *see also Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 470–71, 88 L.Ed.2d 435 (1985); *see, e.g., Cuyler v. Sullivan*, 446 U.S. 335, 346 n. 10, 100 S.Ct. 1708, 1717 n. 10, 64 L.Ed.2d 333 (1980). Therefore, we exercise our supervisory power over the district courts in this circuit to preclude the use of this form of consent directive. In so doing, despite our distaste for its tactics here, we do not attempt to control the executive branch's behavior, *cf. United States v. Payner*, 447 U.S. 727, 737–38, 100 S.Ct. 2439, 2447–48, 65 L.Ed.2d 468 (1980) (Burger, C.J., concurring), but only that of the district courts when requested to intervene to enforce this disingenuous practice.

■ We wish to make clear that this holding is not founded on constitutional grounds, but merely upon our supervisory authority over the district courts in this circuit. We conclude that the directive would have been properly enforceable either if it indicated that it was being executed pursuant to court order or if Alexander had been permitted to indicate that he "[e]xecuted [the directive] under protest." Because the district court forbade Alexander both of these alternatives, we reverse. As a result of this conclusion, we need not address Alexander's other arguments.

Reversed.