# In re GRAND JURY PROCEEDINGS.

## Appeal of William A. RANAURO.

### No. 86–1832.

United States Court of Appeals, First Circuit.

Argued Nov. 7, 1986.

Decided March 23, 1987.

Albert F. Cullen, Jr. with whom Cullen & Wall, Boston, Mass., was on brief for appellant.

Patrick M. Walsh, Sp. Atty., Dept. of Justice, with whom Robert S. Mueller, III, Acting U.S. Atty., and Jeremiah T. O'Sullivan, Sp. Atty., Dept. of Justice, Boston, Mass., were on brief for the United States.

Before COFFIN, BOWNES and BREYER, Circuit Judges.

PER CURIAM.

William A. Ranauro, who is being investigated by a grand jury for possible reporting or currency violations, appeals from a district court order holding him in contempt for refusing to sign a "Direction and Consent" form.[1] The signed form would authorize a Singapore bank to release any records pertaining to accounts or transactions, if any, Ranauro has with the bank. Foreign bank secrecy law impedes the United States from obtaining the records unless Ranauro signs the form.

Ranauro contends that the court's order violates the fifth amendment. His argument is not that the contents of any existing bank records are privileged, but rather, that the signed consent form would amount to compelled self-incriminating testimony.

The fifth amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." Though this language is broad, the Supreme Court has held that the privilege "applies only when the accused is *compelled* to make a *testimonial* communication that is *incriminating.*" *Fisher v. United States,* 425 U.S. 391, 408, 96 S.Ct. 1569, 1579, 48 L.Ed.2d 39 (1976) (emphasis added). It is clear that the district court's order forcing Ranauro to choose between signing the consent form and the penalty of contempt constitutes compulsion within the meaning of the fifth amendment. What is less apparent is whether the signed consent form is a testimonial self-incriminating communication within the scope of the privilege.

Though the fifth amendment was historically interpreted to protect an accused from being forced to make self-incriminating "communications, whatever

1. See appendix.

form they might take,"[2] the Supreme Court has since limited its coverage to compelled incriminating *testimonial* communications. *Fisher*, 425 U.S. at 408, 96 S.Ct. at 1579. The Supreme Court has indicated that compelled incriminating acts or statements must communicate some assertion, assurance, or admission to fall within the scope of the fifth amendment privilege. In *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), the Court recognized that the act of producing records in response to a documentary subpoena could have testimonial aspects. Specifically, the Court respected the district court's finding, affirmed by the court of appeals, that "enforcement of the subpoenas would compel [the witness] to admit that the records exist, that they are in his possession, and that they are authentic." 465 U.S. at 621, 104 S.Ct. at 1246.

In contrast, the Court has consistently held that physical exemplars are outside the scope of the fifth amendment privilege. *See Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) ("a mere handwriting exemplar ..., like the voice or body itself, is an identifying physical characteristic outside [the fifth amendment's] protection"); *United States v. Wade*, 388 U.S. 218, 222–23, 87 S.Ct. 1926, 1929–30, 18 L.Ed.2d 1149 (1967) (forcing defendant to speak within hearing distance of the witnesses, even to utter words purportedly uttered by the robber, was not compulsion to utter statements of a "testimonial nature"); *Schmerber v. California*, 384 U.S. 757, 763–64, 86 S.Ct. 1826, 1831–32, 16 L.Ed.2d 908 (1966) (blood test evidence, although an incriminating product of compulsion, was not "petitioner's testimony"); *Holt v. United States*, 218 U.S. 245, 252–53, 31 S.Ct. 2, 6, 54 L.Ed. 245 (1910) (fifth amendment "prohibition of the use of physical or moral compulsion to extort communications" does not prohibit compelling accused to don blouse worn by perpetrator and exhibit his person for observation by a prosecution witness prior to trial).

The Supreme Court has stated that the difficult question of whether a particular communication involves compelled testimonial self-incrimination within the scope of the privilege may not be answered categorically, but rather, may depend upon the facts and circumstances of the particular case. *Fisher v. United States*, 425 U.S. at 410, 96 S.Ct. at 1580. In this case, the carefully drafted statement—"I consent to the production of records in my name, if such records exist" —does not itself assert the existence of any bank records in Ranauro's name. Nor does it admit the authenticity of or Ranauro's control over any records which might be produced by the bank. It does, however, admit and assert Ranauro's consent. The fact of Ranauro's consent is potentially incriminating, for it could be used, before the grand jury or at trial, to prove the ultimate facts that accounts in Ranauro's name existed or that Ranauro controlled those accounts. We explain with the following scenario: Suppose that at trial the government were to introduce bank records produced in response to a subpoena that had been accompanied by the consent form and that it was not apparent from the face of the records or otherwise how Ranauro was linked to them. Suppose also that the government then introduced the subpoena and consent form, and a government witness testified that the bank records were received in response to the subpoena and consent form. Would not the evidence linking Ranauro to the records be his own testimonial admission of consent? We believe it would. In other words, the testimonial admission (in substance, "I consent to the release of records relating to accounts, if any, which you, bank, believe are mine") would have been used as some evidence of Ranauro's control of the accounts. For this reason, we conclude that the fifth amendment prohibits the government from using Ranauro's compelled admission of consent as evidence against him.

---

2. *Schmerber v. California*, 384 U.S. 757, 763, 86 S.Ct. 1826, 1831, 16 L.Ed.2d 908 (1966). In *Schmerber* the Supreme Court expressly stated that its holding was "not to be understood as adopting the Wigmore formulation" that "'the privilege is limited to testimonial disclosures.'" 384 U.S. at 763 n. 7, 86 S.Ct. at 1832 n. 7.

■ Our brother dissents on the ground that the order compelling Ranauro to grant his consent does not subject him to the risk of perjury. We doubt that such a risk is always a prerequisite to invocation of the privilege. The Court in *Murphy v. Waterfront Commission*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964) noted "the cruel trilemma" (self-accusation, perjury, or contempt) as one of no fewer than seven "fundamental values" that are reflected by the privilege.[3] That the risk of perjury is not always present is illustrated by perhaps the most blatant imaginable example of a fifth amendment violation, where a court orders a suspect to either swear to a prepared confession or suffer the penalties of contempt.

■ Nor do we agree with our brother's conclusion that the consent form in this case can be likened to a physical exemplar. Since the content of a physical characteristic—the bloodtype, handwriting style, or fingerprint configuration—pre-exists any court order, the only thing compelled by the government in a physical exemplar case is the *act of producing* the pre-existing physical characteristic in the form of a sample. Since the *creation* of the characteristic is not compelled, its content, even if testimonial and no matter how incriminating, falls outside the scope of the privilege. In contrast, in this case the government is compelling the *creation of the content*, not the production, of the evidence "I consent." For this reason, the content of the testimonial and incriminating consent form, unlike the content of a physical exemplar, falls within the scope of the privilege.

We also believe that we are justified in grounding our judgment upon our supervisory powers over the administration of criminal justice within the federal courts of our circuit. *See, e.g., Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) (Federal appellate courts may require lower federal courts "to follow procedures deemed desirable from the viewpoint of sound judicial practice although in nowise commanded by statute or by the Constitution.); *Murphy v. Waterfront Commission*, 378 U.S. at 91, 84 S.Ct. at 1624 (Harlan, J., concurring); *McNabb v. United States*, 318 U.S. 332, 340, 63 S.Ct. 608, 609, 87 L.Ed. 819 (1942) ("Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence."). Even if the consent form in this case were not, by itself, to be considered direct testimony by Ranauro of his control over whatever bank accounts are produced as a result of his execution of the form, it so closely approximates such testimony that we believe its compelled creation and subsequently incriminating use would violate not only the values underlying the fifth amendment but also the essence of our accusatorial system of justice:

[T]he constitutional foundation underlying the privilege is the respect a government—state or federal—must accord to the dignity and integrity of its citizens. To maintain a "fair state-individual balance," to require the government "to shoulder the entire load," to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence

---

3. In the words of Justice Goldberg,

[t]he privilege against self-incrimination ... reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individu-

al alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load"; our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life"; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes "a shelter to the guilty," is often "a protection to the innocent."

*Murphy v. Waterfront Commission*, 378 U.S. at 55, 84 S.Ct. at 1596 (citations omitted).

against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth.

*Miranda v. Arizona*, 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966) (citations omitted). *See also Watts v. Indiana*, 338 U.S. 49, 54, 69 S.Ct. 1347, 1350, 93 L.Ed. 1801 (1949) ("Under our system society carries the burden of proving its charge against the accused not out of his own mouth.").

We are further troubled by the fact that the consent directive does not indicate that it is being executed under the compulsion of a court order. While we do not adopt Ranauro's position that this omission rises to the level of a due process violation, or that, in signing the form, Ranauro would be making a willful false statement in violation of federal law, we do think that it offends the basic values underlying our criminal justice system to force a citizen, under penalty of contempt, to assert "I [voluntarily] consent," when, in fact, he does not, and then to allow that assertion to be introduced against him in an incriminating way at trial. Since the government has not demonstrated any need for the consent form in this case, presumably having other means of identifying the bank records, our exercise of supervisory powers protects the values underlying the privilege against self-incrimination and the accusatorial criminal justice system without preventing the government from proving its case.

We find support for our conclusions in two decisions of the Second Circuit. In *United States v. Davis*, 767 F.2d 1025 (2nd Cir.1985), the court acknowledged that "a directive authorizing the disclosure of records might have had communicative aspects of its own," but held that any problem of testimonial self-incrimination was solved by the district court's order that the "Government could not use the directive as an admission that the bank accounts existed, that [the witness] had control over them, or for any other purpose." 767 F.2d at 1040.[4]

The court recently reaffirmed this reasoning in *In re N.D.N.Y. Grand Jury Subpoena # 86–0531–S*, 811 F.2d 114, 116, (2nd Cir.1987), holding that a similar consent directive did not implicate testimonial compulsion because "[al]though the directive in this case does not expressly provide that it may not be used as an admission by [the witness] for any purpose, it seems clear that the government could not so use it consistently with [the witness's] fifth amendment rights." The Second Circuit was particularly troubled by the fact that the consent directive did not contain a statement revealing that it was executed pursuant to court order. Observing that enforcement of the directive "offends basic precepts of honest behavior by invoking the district court's imprimatur on a document that would be misleading," the court exercised its supervisory power to prohibit the use of the form. *Id.* at 117.

■ We acknowledge that two circuit courts have reached contrary conclusions. *United States v. Ghidoni*, 732 F.2d 814 (11th Cir.1984); *In re United States Grand Jury (Cid)*, 767 F.2d 1131 (5th Cir. 1985) (adopting the reasoning in *Ghidoni*). We observe preliminarily that the directives involved in those cases, unlike the directive here, indicated that they were executed under court order. Our holding does not rest on solely on differences in the wording of the forms, however, for we disagree with the *Ghidoni* court's conclusion that the consent directive contained no testimony relevant to the questions of existence of accounts in the witness's name or of control over those accounts. 732 F.2d at 818. The compelled statement was a testimonial assertion of consent, albeit an assertion of consent under court order, which could have been used to demonstrate

---

4. We note that the Second Circuit's solution to the problem of compelled testimonial self-incrimination—a judicial grant of constructive use immunity—appears to be inconsistent with the Supreme Court's ruling in *United States v. Doe*, 465 U.S. at 616, 104 S.Ct. at 1244, that federal courts lack jurisdiction to grant prospective use immunity absent a formal governmental request under 18 U.S.C. §§ 6002 & 6003. Our holding today complies with the dictates of *Doe*. *See infra* p. 796.

the incriminating facts that accounts in the witness's name existed and that the witness controlled them. Though the assertion of consent would not itself have established the ultimate facts of existence or control, it would have been compelled testimony that could have furnished a link in the chain of evidence needed to prove those facts. *See Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951); *In re Kave,* 760 F.2d 343 (1st Cir.1985).

The *Ghidoni* opinion posits that the nontestimonial nature of the consent directive is demonstrated by the fact that "[a]fter executing the directive, Ghidoni can still maintain that the records do not exist, [and] that he does not control them." 732 F.2d 819. This reasoning fails, however, for once Ghidoni signed the consent form, he could no longer argue that he did not consent to the release of the accounts. The admission of consent *would* be contrary to the position that the accounts did not exist and that he did not control them, for it could be used as a link in the chain proving both their existence and his control over them.

▪ As we recognized in *In re Grand Jury Proceedings,* 626 F.2d 1051, 1057–58 (1st Cir.1980), neither this court nor the district court has jurisdiction to grant prospective immunity with respect to the potentially incriminating uses of the consent form absent a formal request by the government under 18 U.S.C. §§ 6002–03. *See United States v. Doe,* 465 U.S. at 615–16, 104 S.Ct. at 1243–44. If, on remand, the government decides to seek an order requiring appellant to sign the consent form, the statutory procedure for requesting use immunity must be followed. The grant of immunity sought need only be as broad as the privilege against self-incrimination. *See United States v. Doe,* 465 U.S. at 617 n. 17, 104 S.Ct. at 1244 n. 17; *In re Grand Jury Proceedings,* 626 F.2d at 1058 (1st Cir.1980). Thus, if the government is able, without using the consent form, to provide an appropriate foundation for the introduction of whatever records would be produced as a consequence of the signing of the consent form, the fifth amendment will not prevent the introduction of such records at trial. In contrast, any grant of immunity must protect Ranauro from the use of the consent form to link him in an incriminating manner with the accounts or to prove his control over them.

*The order holding appellant in contempt is reversed; the order requiring appellant to sign the consent form is vacated, and the case is remanded to the district court for proceedings not inconsistent with this opinion.*

## APPENDIX

### DIRECTION AND CONSENT

I, WILLIAM A. RANAURO, consent to the production to the United States District Court for the District of Massachusetts, United States of America, and to the Grand Jury presiding under that Court's jurisdiction, of any and all records related to any accounts held by, or banking transactions engaged in with, BANQUE INTERNATIONALE A LUXEMBOURG (ASIA) Ltd., S.A., which are in the name of, or on behalf of: WILLIAM A. RANAURO, *D.O.B.* February 9, 1946, *SSN:* 022–34–9696, if any such records exist.

This Direction and Consent extends to Banque Internationale A Luxembourg (Asia) Ltd., S.A., and its servants, agents and employees giving evidence before the Grand Jury, or in a trial proceeding, in the United States District Court for the District of Massachusetts. It likewise extends to the Singapore Branch of said Bank, and any other office or branch of said Bank, whereever such records, if any, are situated.

Copies of the documents referred to, if any, may be produced to the extent that originals are not available. The term copies includes; but is not limited to: photostatic and microfilm copies; material contained on magnetic tapes or a similar system of recordkeeping.

DATED at Boston, Massachusetts, this ———— day of March, 1986,

WILLIAM A. RANAURO

BREYER, Circuit Judge (dissenting).

I agree with the majority that, under controlling Supreme Court precedent, the Fifth Amendment's privilege against self-incrimination "applies only when the accused is compelled to make a *testimonial* communication that is incriminating." *Fisher v. United States*, 425 U.S. 391, 408, 96 S.Ct. 1569, 1580, 48 L.Ed.2d 39 (1976) (emphasis in original). I also agree that "compelled incriminating acts or statements" are testimonial only if they "communicate some assertion" (including an "assurance" or "admission"). *Ante* at 793. After all, the Supreme Court has written that a fundamental purpose of the privilege is to avoid "subject[ing] those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt," *Murphy v. Waterfront Commission*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964)—and, one can commit "perjury" only with respect to an assertion. I do not agree, however, with the majority's conclusion that the court order before us compels any such testimonial assertion.

The court has ordered Ranauro to sign a form that says, in substance, "I consent to the release of records in my name, if they exist." Ranauro's signature will lead to the release of bank records if they exist, but he does not assert in signing the form that they do exist. He could not lie or commit perjury either by signing or by not signing the form. He has not been asked a question to which he could respond with either the truth or a lie. Ranauro's position is similar to that of a suspect compelled to stand in a lineup, to give a handwriting or blood sample, to speak lines, or to put on clothing. *See Gilbert v. California*, 388 U.S. 263, 266–67, 87 S.Ct. 1951, 1953, 18 L.Ed.2d 1178 (1967) (handwriting exemplar); *United States v. Wade*, 388 U.S. 218, 222–23, 87 S.Ct. 1926, 1929–30, 18 L.Ed.2d 1149 (1967) (lineup and voice exemplar); *Schmerber v. California*, 384 U.S. 757, 763–65, 86 S.Ct. 1826, 1831–1832, 16 L.Ed.2d 908 (1966) (blood test); *Holt v. United States*, 218 U.S. 245, 252–53, 31 S.Ct. 2, 6, 54 L.Ed. 1021 (1910) (donning clothing). In each of these instances a person is compelled to provide possibly in-criminating evidence, but is *not* asked to make a (potentially false) assertion. These cases are unlike those in which a witness is compelled to produce records that the government believes are in his possession. In such cases, the government in essence asks, "Do you have these records?" If the witness in fact possesses the records, he has the option either to produce them and assert (truthfully) that he has them or to assert (falsely) that he does not have them. Thus, the Supreme Court has held that the production of documents may be a privileged testimonial act. *See United States v. Doe*, 465 U.S. 605, 613–14, 104 S.Ct. 1237, 1242–43, 79 L.Ed.2d 552 (1984) (holding that the act of producing subpoenaed documents, if that act is incriminating, is privileged and cannot be compelled without a grant of use immunity). *But cf. Fisher v. United States*, 425 U.S. at 411, 96 S.Ct. at 1581 (holding that because the existence and location of subpoenaed documents are a "foregone conclusion," their production, although testimonial, is not *incriminating* and is hence not privileged).

In order to find an incriminating assertion here, the majority suggests that Ranauro has "assert[ed] . . . consent." *Ante* at 793. It then imagines what strikes me as a farfetched scenario: that Ranauro's signature on the consent form leads to the release of the records; that the government later has trouble identifying the records as Ranauro's; and that the government then seeks to use the production of the records in response to the consent form to prove a connection between the records and Ranauro. Even if one assumes such a scenario, however, the Fifth Amendment privilege does not apply, because the inference that the records belong to Ranauro would not depend upon the jury's belief in the truth of Ranauro's "assertion" of consent. Rather, the inference would depend upon the non-assertive fact that Ranauro placed his signature at the bottom of a consent form. Whether Ranauro did so voluntarily or involuntarily, while wishing to release the documents or not wishing to release them, while thinking that he really was consenting or not, is all

no more relevant than whether a suspect believes the truth of the words he speaks for purposes of voice identification. In fact, the inference a jury might draw here is rather like the one it might draw on hearing that a key taken from an arrested suspect opened a safe deposit box containing contraband. The inference simply does not depend on the truth of any assertion Ranauro has made.

The majority is wrong in stating that Ranauro has "assert[ed] . . . consent." Ranauro does not "assert" consent (nor does he "admit" consent or "assure" consent); rather, he performs a verbal act: he *grants* consent. (When I say, "I promise to pay tomorrow," I do not *assert* a promise, I simply promise.) This 'linguistic' point is important because a grant of consent is not the kind of thing that can be true or false (any more than a promise can be true or false—although it can be sincere or insincere); it is not a proper subject matter of a perjury proceeding. This distinction, in turn, is important because it is the distinction the Supreme Court seems to be making in permitting assertion of the privilege in cases such as *Doe* (subpoenaed documents) but denying it in cases such as *Gilbert* (handwriting sample). *See supra* at 797. Ranauro's grant of consent falls outside the privilege applicable to *testimonial* communications.

Let me add that I do *not* mean to say that the Fifth Amendment can apply only when indictable "perjury" is at issue. Rather, I note simply that legal perjury and the Fifth Amendment have one thing in common: both deal with assertions—the kind of communication that could, in principle, be false. It is the absence of a relevant assertion here that leads me to think that Ranauro's signature on the consent form is not 'testimonial' and is hence outside the Fifth Amendment.

The majority also refers to our "supervisory powers." In my view, its argument that we should exercise our supervisory powers to bar the government from using the consent form to demonstrate a connection between Ranauro and the documents is a strong one. *See In re N.D.N.Y. Grand Jury Subpoena # 86-0351-S*, 811 F.2d 114, 117 (2d Cir.1987) (exercising court's supervisory power over the district court to preclude the use of this sort of consent directive). Even if Ranauro's signature on the form is nontestimonial, the use to which the government (in the hypothetical scenario) might put the compelled signature is a seriously incriminating one. The government does not claim that it needs the signature to help identify those records once they are released, and it has not sought the signature for that purpose. This court may justifiably prevent the government from compelling the production of incriminating evidence for which the government has shown no need. The proper remedy, however, would be a court order barring the government from using the consent form at trial to show a connection between Ranauro and the documents. It would not be a requirement that the government provide Ranauro with a "use immunity" of somewhat uncertain scope.

Accordingly, I dissent from the opinion insofar as it finds a violation of the Constitution, but not otherwise.