**In re GRAND JURY SUBPOENA.**

**TWO GRAND JURY CONTEMNORS, Appellants,**

v.

**UNITED STATES of America, Appellee.**

No. 1575, Docket 87–6165.

United States Court of Appeals, Second Circuit.

Argued July 14, 1987.

Decided Aug. 14, 1987.

Cristina C. Arguedas, Berkeley, Cal. (Penelope M. Cooper, Cooper & Arguedas, Berkeley, Cal., of counsel), Peter E. Fleming, New York City (William L. Osterhoudt, San Francisco, Cal., and Curtis, Mallet-Prevost, Colt & Mosle New York City, of counsel), for appellants.

Baruch Weiss, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty.

S.D.N.Y., Bruce A. Green, Asst. U.S. Atty., of counsel), for appellee.

Before NEWMAN, MINER and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Appellants, two witnesses before the grand jury, appeal from orders of the United States District Court for the Southern District of New York (Vincent L. Broderick, *Judge*), which held them in civil contempt for refusing to sign directives authorizing foreign financial institutions to release documents and information to the government, and ordered them confined until they signed the directives. 28 U.S.C. § 1826(a). Appellants contend *inter alia* that compelled execution of the directives, as written, would violate their fifth amendment privilege against self-incrimination and right to due process of law. Because we find no fifth amendment violation here, we affirm.

## FACTS and BACKGROUND

On May 28 and 29, 1987, the grand jury issued subpoenas duces tecum to appellants which required them to sign "consent directives" which were attached to the subpoenas. The directives provided that the signator, i.e., both appellants, authorized foreign financial institutions to disclose to the government information and documents relating to accounts maintained by appellants, or their corporations, at the foreign financial institutions. The directives did not acknowledge that accounts in foreign financial institutions were in existence or that they were controlled by appellants. Nor did the directives indicate whether documents or any other information relating to appellants were present at foreign financial institutions, assuming that such accounts did exist.

The directives provided that they should be "construed as consent" with respect "to any and all bank confidentiality laws of any state or nation." In addition, and apparently to make it clear that, although the directives were to be construed as consent, they nevertheless were being compelled by the grand jury, the directives provided that they were executed "in compliance with the direction of a Grand Jury Subpoena Duces Tecum."

On June 8, 1987, appellants filed motions to quash the subpoenas, arguing *inter alia* that compelled execution of the directives would violate their fifth amendment rights. After a hearing on June 15, 1987, the district court denied their motions to quash after it found that execution of the directives by appellants would not involve testimonial communications, and thus created no basis for fifth amendment violations. The district court then ordered appellants to appear before the grand jury to sign the directives.

In light of appellants' objections to some of the language contained in the directives, however, the district court modified them by changing the title from "Consent Directive" to "Directive," and specifying that they were being executed in compliance with a court order, rather than in compliance with the direction of a grand jury subpoena. The district court also provided that the directives could not be used as an admission against appellants in any subsequent trial, and it inserted a time limitation in the directives so that, as modified, they authorized disclosure of information and records dating back to 1980.

On June 22, 1987, appellants appeared before the grand jury and refused to sign the directives as modified by the district court, despite being ordered to do so by the grand jury foreman. On the same day, and after a hearing, the district court found appellants in civil contempt, and ordered them incarcerated until such time as they executed the modified directives. 28 U.S.C. § 1826(a). At the hearing, the district court again stated that it found no testimonial communications implicated by the execution of the directives, and noted that if appellants had executed the directives, the government would have been barred from using them as an admission in any subsequent trial. The district court stated that it did not feel its order excluding the admission of the directives into evidence was required by the fifth amendment, but was

in response to Second Circuit precedent which provided for such exclusion.

The district court then denied appellants' motion for a stay or bail pending appeal of the contempt and confinement orders, but granted them a limited stay to apply to this court for a stay pending appeal. On June 25, 1987, we continued the stay of confinement until the matter could be heard on an expedited basis, and at oral argument on July 14, 1987, we continued the stay until disposition of this appeal. For the reasons stated below, we affirm the district court orders holding appellants in contempt, and accordingly, lift the stay of execution of the confinement orders.

## DISCUSSION

In this expedited appeal, appellants present several challenges to the district court orders requiring them to sign the directives at issue. Appellants assert, first, that the orders violated their fifth amendment privilege against compelled self-incrimination; and second, that absent language in the directives indicating that appellants signed them under protest and under threat of confinement, they were being compelled to sign false documents. Appellants also raised other challenges which we find are without merit, and thus we summarily reject them.

With respect to the self-incrimination claim, appellants recognize that precedent in this Circuit has approved of the compelled execution of directives in the face of fifth amendment challenges, *In Re N.D. N.Y. Grand Jury Subpoena,* 811 F.2d 114 (2d Cir.1987), and *United States v. Davis,* 767 F.2d 1025 (2d Cir.1985), but contend that those cases conflict with the Supreme Court's decision in *United States v. Doe,* 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), to the extent that they purportedly relied on a de facto use immunity to obviate any fifth amendment problems. Appellants thus invite us to reverse our prior decisions in light of this conflict, and hold that compelled execution of the directives violates their fifth amendment privilege against sef-incrimination. We decline appellants' invitation, and we write here to clarify the meaning of our prior decisions.

### 1. *Self-incrimination claim.*

 The fifth amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Despite this broad language, however, the fifth amendment does not proscribe the compelled production of every sort of incriminating evidence. *Fisher v. United States,* 425 U.S. 391, 408, 96 S.Ct. 1569, 1579, 48 L.Ed.2d 39 (1976). Historically, the privilege has been interpreted to protect a witness from being compelled to make self-incriminating "communications, whatever form they might take[.]" *Schmerber v. California,* 384 U.S. 757, 763–764, 763 n. 7, 86 S.Ct. 1826, 1832 n. 7, 16 L.Ed.2d 908 (1966) (refusing to adopt Wigmore's formulation of the privilege which covered only "testimonial disclosures"). The scope of the privilege, however, has since been limited, and it now "applies only when the accused is compelled to make a *testimonial* communication that is incriminating." *Fisher,* 425 U.S. at 408, 96 S.Ct. at 1579 (emphasis in original). In contrast, the privilege does not bar compelling an accused to provide, or making him the source of, real or physical evidence, *Schmerber,* 384 U.S. at 764–765, 86 S.Ct. at 1832, even though the accused may be compelled to speak, *United States v. Wade,* 388 U.S. 218, 222–223, 87 S.Ct. 1926, 1929–1930, 18 L.Ed.2d 1149 (1967), or write, *Gilbert v. California,* 388 U.S. 263, 266–267, 87 S.Ct. 1951, 1953, 18 L.Ed.2d 1178 (1967), provided that his speech or writing exemplar is sought for identification purposes, and not to "disclose any knowledge he might have." *Wade,* 388 U.S. at 222, 87 S.Ct. at 1930.

 To establish a fifth amendment violation, appellants must therefore demonstrate the existence of three elements: 1) compulsion, 2) a testimonial communication, and 3) the incriminating nature of that communication. *In re N.D.N.Y. Grand Jury Subpoena,* 811 F.2d 114, 116 (2d Cir. 1987). The compulsion element is clearly

present here. *See United States v. Browne*, 624 F.Supp. 245, 248 (N.D.N.Y. 1985) (where the court orders an individual to sign a consent form after he refuses, the element of compulsion is met). More troublesome, though, is the question of whether ordering appellants to sign the directives—and thus requiring them to authorize disclosure of records and information if any exist—constitutes testimonial self-incrimination. We conclude, however, that it does not.

At the outset, we emphasize that appellants do not contend, nor could they argue, that their fifth amendment privilege extends to preclude the financial institutions from producing records or information regarding appellants' transactions. *United States v. Davis*, 767 F.2d 1025, 1039 (2d Cir.1985). Thus, since the directives are the only communications which appellants were compelled to make, they are the only possible source of a fifth amendment violation. *Id.*

In this regard, we have twice approved of the compelled execution of a directive in the face of fifth amendment self-incrimination challenges. Thus, in *Davis*, while we observed that a directive, such as the one at issue, *may* have had aspects that were communicative in nature, 767 F.2d at 1040, we nevertheless rejected the appellant's fifth amendment challenge because we found that any potential fifth amendment problems were obviated by the fact that the district court precluded the government from using the directive as an admission at trial. *Id.* We did not, however, decide in *Davis* whether the communicative aspects of the directive were either testimonial or incriminating in nature.

Recently, however, we were called upon to address the precise questions which were left unresolved in *Davis*. Thus, in *In re N.D.N.Y. Grand Jury Subpoena*, 811 F.2d 114 (2d Cir.1987), we considered, in a factual context quite similar to the instant appeal, whether compelled execution of a directive—whose wording was nearly identical to the one at issue—constituted a *testimonial* communication that was incriminating. There, we observed that the directive at issue employed language "that require[d] disclosure [of bank records] only *if* the bank ha[d] such accounts." *Id.* at 117 (citations omitted) (emphasis in original). Relying on the Eleventh Circuit decision in *United States v. Ghidoni*, 732 F.2d 814 (11th Cir.), *cert. denied*, 469 U.S. 932, 105 S.Ct. 328, 83 L.Ed.2d 264 (1984), we concluded that "executing th[e] directive would not implicate any testimonial communication," and thus would not impair the appellant's fifth amendment rights. 811 F.2d at 117.

In both *Davis* and *In re N.D.N.Y. Grand Jury Subpoena*, we adopted the Eleventh Circuit's approach toward resolving these questions as set forth in *United States v. Ghidoni, supra*. In *Ghidoni*, the Eleventh Circuit was confronted with the same question presented in the instant appeal. The directive at issue there differed from the ones here in only minor respects. For example, it was entitled "consent directive," rather than "directive," and, in addition to using language indicating that it was directed to any bank where appellant had an account, it also named a specific bank, whereas the directives at issue here do not name any specific bank or financial institution.

After first setting out general fifth amendment principles, the *Ghidoni* court then reviewed the directive in light of those Supreme Court decisions addressing the testimonial and incriminating aspects of the compelled production of documents, i.e., *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), and *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). Thus, the *Ghidoni* court likened the situation before it— where an individual was being compelled to authorize and direct a third party, i.e., the banks, to produce documents—to the situations presented in *Doe* and *Fisher*, where an individual was compelled to produce the documents himself.

The *Ghidoni* court, accordingly, examined the directive to determine whether it contained any testimonial assertion regarding the documents sought from the banks. The court concluded that the directive was

"devoid of any testimonial aspects," 732 F.2d at 818, after it found that "nothing in the directive implie[d] that [bank] accounts exist," that it contained no statements regarding possession or control over such accounts, and that it could not be used to authenticate any records obtained. *Id.* at 818–819. The court thus concluded that compelled execution of the directive would not violate the privilege against self-incrimination because the directive itself was not testimonial in nature. *Id.* at 819. In upholding the compelled execution of the directive, the court further observed that the defendant was only being compelled to "waive a barrier [i.e., foreign states' confidentiality laws] to permit the bank to produce documents"—an *act* which it concluded provided no testimonial assertions. *Id.* at 819 n. 12.

The *Ghidoni* decision is not without criticism. Its approach to these questions was recently rejected by the First Circuit in *In re Grand Jury Proceedings (Ranauro),* 814 F.2d 791 (1st Cir.1987). *In Ranauro,* the First Circuit agreed with the *Ghidoni* court's conclusion that the directive itself does not assert that any records exist, that the appellant has control over such accounts, or that any records obtained would be authentic. *Id.* at 793. The court observed, however, that the directive did "admit and assert [the appellant's] consent," *id.,* and thus it concluded that his assertion of consent could be potentially incriminating, because it might later be used "to prove the ultimate facts that accounts in [appellant's] name existed or that [appellant] controlled those accounts." *Id.* To illustrate how the directive may later be used at trial as self-incriminating testimony, the court posited the following hypothetical:

> Suppose that at trial the government were to introduce bank records produced in response to a subpoena that had been accompanied by the consent form and that it was not apparent from the face of the records or otherwise how [appellant] was linked to them. Suppose also that the government then introduced the subpoena and consent form, and a government witness testified that the bank records were received in response to the subpoena and consent form. Would not the evidence linking [appellant] to the records be his own testimonial admission of consent? We believe it would.

*Id.* Thus, the court found that since the directive contained a statement admitting his consent, that statement, standing alone, constituted a self-incriminating testimonial communication. *Id.* The court, accordingly, concluded that compelled execution of the directive would violate the fifth amendment. *Id.*

■ While we see some merit in the First Circuit's approach, we are constrained here to apply our precedent in *N.D.N.Y. Grand Jury Subpoena,* and follow the analysis set forth in *Ghidoni.* We therefore hold that because the directives here contain no testimonial assertions, the district court orders compelling appellants to sign the directives provide no basis for a fifth amendment violation. The directives here, as in *Ghidoni,* do not contain any assertions by appellants regarding the existence of, or control over, foreign bank accounts. They authorize disclosure of records and information only if such accounts exist. We also agree with the *Ghidoni* court's conclusion that the directives could not be used to authenticate any bank records obtained.

In affirming the district court here, however, we necessarily must clarify certain aspects of our holdings in *Davis* and *In re N.D.N.Y. Grand Jury Subpoena.* Appellants suggest that the determination of the fifth amendment question in those decisions rested on the fact that the government was precluded from using the directive at trial as an admission against the signator of the directive. Appellants contend that we recognized in those cases that the directives were both testimonial and incriminating, and that by sanctioning a district court order precluding admission of the directives into evidence, we were approving of a de facto use immunity—a practice forbidden by *United States v. Doe,* 465 U.S. 605, 614–17, 104 S.Ct. 1237, 1243–44, 79 L.Ed.2d 552 (1984).

■ In light of our holding today, it is clear that the fifth amendment would not stand as a bar to admission of the directives into evidence at trial because the directives contain no testimonial assertions that are incriminating, and thus do not implicate fifth amendment questions. *But cf. In re N.D.N.Y. Grand Jury Subpoena,* 811 F.2d at 117. We also note, however, that since the directives contain no statements regarding existence of, or control over, any accounts, they should be excluded from evidence because they lack any probative value. *Ghidoni,* 732 F.2d at 818 & n. 9.

Appellants argue that when the district court entered its order excluding the directives from evidence, it accordingly created a de facto use immunity for statements made in the directives. We disagree. When the district court entered its orders precluding admission of the directives into evidence, it was merely ruling on evidentiary questions relating to materiality, relevance, prejudice, etc., all of which could be and were resolved in the sound discretion of the district court. We conclude here that, because the directives lack any probative testimonial value on the issue of existence or control, *Ghidoni,* 732 F.2d at 818 & n. 9, the district court properly excluded them from evidence.

## II. *Due process claim.*

■ Appellants also claim that by signing the directives at issue they were being forced to sign a document containing false or misleading statements in violation of their right to due process of law. Appellants contend that since they were not "authorizing" or "directing" the foreign financial institutions to do anything, except in compliance with a court order, the directives, as written, do not adequately indicate their coerced nature. Accordingly, they request that we reverse the contempt orders because the directives do not state that appellants were compelled to sign

them "under protest" or "under the threat of incarceration."

We reject appellants' arguments. The directives, as written, satisfied the requirements set out in *In re N.D.N.Y. Grand Jury Subpoena,* 811 F.2d at 117–118. There, we held that so long as a directive indicated that it was signed under protest *or* pursuant to a district court order, it would not be considered misleading. *Id.* at 118. Here, the directives included language indicating that they were signed pursuant to a district court order, and thus they adequately reflected their coerced nature.

Affirmed.

JON O. NEWMAN, Circuit Judge, concurring:

I concur in Judge Altimari's opinion but write separately because I do not believe the path of our prior decisions nor the outcome to which they lead us in this case is quite so clear as my colleagues suggest.

The use of a grand jury subpoena to compel a person to "consent"[1] to disclosure and production of bank records concerning his account is a device of very recent origin. The first appellate decision to consider whether this device violates the privilege against self-incrimination appears to be *United States v. Ghidoni,* 732 F.2d 814 (11th Cir.1984), an appeal from a contempt adjudication for refusal to sign the "consent." A divided panel approved the device, concluding that signing the "consent" form was not a " 'testimonial communication,' " *id.* at 816 (quoting *Fisher v. United States,* 425 U.S. 391, 408, 96 S.Ct. 1569, 1579, 48 L.Ed.2d 39 (1976)), and for that reason was not protected by the privilege. The majority believed that a communication is testimonial when it asserts a fact (involves " 'truth-telling,' " *id.* at 818), and that the "consent" form contained no assertion of fact.[2]

1. I put the word in quotation marks to acknowledge the oxymoronic nature of a compelled "consent."

2. The dissent in *Ghidoni* rests on the view that the "consent" was protected by the privilege

because "it furnishes a link in the chain leading to procurement of the documents that the government intends to use to secure Ghidoni's conviction." 732 F.2d at 821 (Clark, J., dissenting). That argument is not entirely satisfactory.

This Circuit first encountered the problem the following year in *United States v. Davis,* 767 F.2d 1025 (2d Cir.1985). *Davis* was an appeal from a conviction. One ground of the appeal was the use in evidence of bank records obtained as a result of a "consent" signed by the defendant under the compulsion of a court order. The Court apparently accepted the defendant's premise that, if the "consent" had been compelled in violation of the self-incrimination privilege, the bank records should not have been admitted into evidence. The defendant had not tested the compulsion order by resisting the order and appealing a contempt adjudication. Facing the issue of whether the "consent" order violated the privilege, the Court conceded that the "consent" form "might have had communicative aspects of its own," *id.* at 1040. The Court rejected this possibility in the following passage:

> However, [the District Judge's] carefully crafted order specifically provided that the Government could not use the directive as an admission that the bank accounts existed, that Davis had control over them, or for any other purpose. These limitations on the use of the directi[ve] obviate any claim of testimonial compulsion. *See Ghidoni, supra.*

*Id.*

This passage is subject to two interpretations. One, urged by the appellants in the pending appeal, is that the District Judge in *Davis* had precluded use of the "consent" directive at trial by, in effect, conferring "use" immunity. Had this occurred, appellants point out, the District Judge would have been exceeding his authority, since the Supreme Court has made it clear that "use" immunity may not be informally conferred but requires a formal request by the Department of Justice pursuant to 18 U.S.C. §§ 6002, 6003 (1982). *United States v. Doe,* 465 U.S. 605, 616 & n. 16, 104 S.Ct. 1237, 1244 & n. 16, 79 L.Ed.2d 552 (1984). From this interpretation of the *Davis* passage appellants contend that *Davis* rejected the self-incrimination objection on an impermissible basis and that we must now consider anew the issue of whether the "consent" directive is protected by the privilege.[3]

The second interpretation of the *Davis* passage, adopted by Judge Altimari's opinion, is that the *Davis* panel did not think that the District Judge had endeavored to confer "use" immunity, but had considered him merely to have made an evidentiary ruling. Under this interpretation, the "consent" directive did not violate the self-incrimination privilege because it contained nothing of evidentiary significance. If I were focusing solely on the two sentences quoted above, I would have some doubts about that interpretation of *Davis.* However, my doubts are allayed by the citation to *Ghidoni* that immediately follows these sentences. *Ghidoni* explicitly pointed out, albeit in a footnote, that "use" immunity was not being conferred, that informal judicial "use" immunity was prohibited by *United States v. Doe, supra,* and that the "consent" directive was deemed not to be testimonial because it "lack[ed] any *probative* testimonial value on the issue of control or existence [of the bank records]." 732 F.2d at 818 n. 9 (emphasis added). By

---

The "link in the chain" basis for invoking the privilege normally applies when the compelled answer itself is plainly testimonial and the facts disclosed by the testimonial answer lead to discovery of incriminating testimony or real evidence. *See Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951); *Blau v. United States,* 340 U.S. 159, 161, 71 S.Ct. 223, 224, 95 L.Ed. 170 (1950); *United States v. Burr,* 25 F.Cas. 38 (C.C.D.Va.1807) (No. 14,692e). If the majority in *Ghidoni* is correct that the "consent" is not testimonial and for that reason not protected by the privilege, it cannot become so because it will lead to incriminating evidence. Much compelled evidence, such as handwriting exemplars, fingerprints, and blood

samples, leads to the development of highly incriminating testimony, but compulsion of such evidence does not violate the privilege. *See Schmerber v. California,* 384 U.S. 757, 764, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908 (1966).

3. Though a subsequent panel is obliged to follow the precedents established by prior panels of this Circuit, including decisions that authoritatively construe and apply Supreme Court decisions, it is by no means clear that a subsequent panel must follow a Circuit precedent that has not reckoned with a prior Supreme Court decision with which the Circuit precedent is in irreconcilable conflict.

citing *Ghidoni,* the *Davis* panel must have been adopting this aspect of *Ghidoni's* reasoning.

Our Court again encountered a "consent" directive earlier this year in *In re N.D.N.Y. Grand Jury Subpoena #86–0351–S (Alexander),* 811 F.2d 114 (2d Cir. 1987), an appeal from a contempt adjudication. The rejection of the self-incrimination objection in *Alexander* perpetuated the uncertainty, created by *Davis,* as to whether this Circuit was relying on some form of unauthorized judicial "use" immunity or on evidentiary considerations. The *Alexander* panel noted that the "consent" directive, unlike the one used in *Davis,* "does not expressly provide that it may not be used as an admission by Alexander for any purpose." *Id.* at 117. Nevertheless, the panel concluded, "it seems clear that the government could not so use it consistently with Alexander's fifth amendment rights. *See Davis,* 767 F.2d at 1040." *Id.* A permissible reading of this sentence, urged by the appellants in the pending case, is that the panel was conferring judicial "use" immunity at the appellate level, something at least as unauthorized as the informal district court "use" immunity proscribed by the Supreme Court in *Doe.* If the panel believed that use of the "consent" directive would have been inconsistent with the witness's self-incrimination privilege and *for that reason* could not be used against the witness, there is some basis for believing that only the appellate preclusion ruling, rather than evidentiary considerations, led to rejection of the self-incrimination objection. However, there are countervailing considerations. First, the panel explicitly relied upon *Ghidoni,* and, like the *Davis* panel, must have understood, as the *Ghidoni* footnote made clear, that informal judicial "use" immunity was not an adequate answer to the self-incrimination objection. Second, the *Alexander* panel, noting that the "consent" directive "requires disclosure only *if* the bank has such accounts," concluded that signing the directive "would not implicate any testimonial communication" and for that reason "does not impair

Alexander's rights under the fifth amendment." *Id.* at 117 (emphasis in original).

Though the matter is not free from doubt, it appears that *Davis* and *Alexander* establish, as the law of this Circuit, that a "consent" for disclosure of records of any bank accounts a witness might have is not a testimonial communication, that it is consequently not protected by the self-incrimination privilege, and that a court order compelling the signing of such a "consent" does not violate the Fifth Amendment. These conclusions are in accord with those of the Eleventh Circuit, *United States v. Ghidoni, supra,* and the Fifth Circuit, *In re United States Grand Jury Proceedings (Cid),* 767 F.2d 1131 (5th Cir. 1985), but are not shared by the First Circuit, *In re Grand Jury Proceedings (Ranauro),* 814 F.2d 791 (1st Cir.1987).

Were the matter open in this Circuit, I would deem the issue to be extremely close. The premise of the conclusion rejecting a self-incrimination objection seems to be that a statement is within the scope of the privilege only if it asserts a fact. As *Ghidoni* puts it, the statement must serve a "truthtelling" function, 732 F.2d at 818. Judge Breyer, dissenting in *Ranauro,* similarly contends that a statement is within the scope of the privilege only when it is "the kind of communication that could, in principle, be false." 814 F.2d at 798. These views of the privilege are derived largely from the Supreme Court's decisions in *Fisher* and *Doe.* The issue in those cases was whether the act of producing documents, not itself the making of a statement, might nonetheless be within the privilege as an implied statement of some fact, for example, the fact that the witness has possession or control of the documents. Because the Supreme Court examined the act of production to see if it implied an assertion of fact, some have drawn the inference that a statement that does not assert a fact is not a testimonial communication. This inference is the inverse of the proposition that all assertions of fact are testimonial communications, and, as logicians inform us, an inverse of a proposition

is possibly but not necessarily so. *See* McCall, *Basic Logic* (2d ed. 1952).[4]

In *Fisher* and *Doe* the Supreme Court did not purport to announce a universal test for determining the scope of the privilege. It simply acknowledged that the privilege applies to *acts* that imply assertions of fact. It did not have occasion to consider the test for determining when the privilege applies to oral or written *communications*. What the Court has clearly decided in earlier cases is that certain acts, though incriminating, are not within the privilege. The privilege is not violated by compelling a person to furnish a handwriting exemplar, *Gilbert v. California*, 388 U.S. 263, 266–67, 87 S.Ct. 1951, 1953, 18 L.Ed.2d 1178 (1967); to stand in a lineup or furnish a voice exemplar, *United States v. Wade*, 388 U.S. 218, 222–23, 87 S.Ct. 1926, 1929–30, 18 L.Ed.2d 1149 (1967); to provide a blood sample, *Schmerber v. California*, 384 U.S. 757, 763–65, 86 S.Ct. 1826, 1831–32, 16 L.Ed.2d 908 (1966); or to don clothing, *Holt v. United States*, 218 U.S. 245, 252–53, 31 S.Ct. 2, 6, 54 L.Ed. 1021 (1910). What the Court has not yet decided is the issue posed by a "consent" directive: Does the privilege apply to every written or oral statement, the content of which might tend to incriminate? *Gilbert* and *Wade* do not answer that question. Even when a person is compelled to utter or write particular words for use as a voice or handwriting exemplar, the resulting oral or written statement is incriminating only because of the physical characteristics of the sounds or the lettering. It is not the content of the statement that creates the risk of incrimination.

To decide whether the privilege applies to every oral or written statement significant because of its content, including those that contain no assertion of fact, would require some consideration of the policies the privilege is designed to protect. As Dean Wigmore has pointed out, there are numerous policies implicated by the privilege, and no agreement on which policies are sufficiently central to warrant constitutional vindication. *See* 8 J. Wigmore, *Evidence* § 2251 (McNaughton rev. 1961). Some emphasize the policy of preventing the unfairness that results when a person must face "the cruel trilemma of self-accusation, perjury or contempt," *Murphy v. Waterfront Commission*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964). Vindicating that policy would lead to a requirement that a statement must assert the truth of something in order to be within the privilege. *See Ranauro, supra,* 814 F.2d at 797 (Breyer, J., dissenting). On the other hand, many emphasize the policy of striking the appropriate balance between the power of the state and the sovereignty of the individual. *See* Griswold, *The Right To Be Let Alone,* 55 Nw. U.L.Rev. 216 (1960). That policy would be vindicated by prohibiting the state from compelling a person to furnish any oral or written statement incriminating because of its content, whether or not the statement makes a factual assertion. That policy would appear to be seriously undermined by the use of state power to compel a person to utter or write words, the content of which signifies "consent" to anything.

I regret that in developing the law of this Circuit we have not confronted directly the issue whether a communication with incriminating content but without an assertion of fact is protected by the privilege.[5] I

---

4. In *Fisher,* Justice White's opinion for the Court notes that in that case the Government was "in no way relying on the 'truthtelling' of the taxpayer to prove the existence of or his access to the documents." 425 U.S. at 411, 96 S.Ct. at 1581. This may imply that "truthtelling" is a prerequisite for the privilege, but that again would be reasoning on the unsure ground of an inverse proposition. Concurring in the judgment in *Fisher,* Justice Brennan asserted, "[I]t does not follow that papers are not 'testimonial' and thus producible because they contain no declarations." *Id.* at 422–23, 96 S.Ct. at 1587.

5. Whether the content of the "consent" directive might be incriminating, even if an assertion of fact is not required to invoke the privilege, is a matter of fair dispute. In *Ranauro,* the First Circuit outlined a chain of incrimination in which the furnishing of consent, followed by a bank's production of records, would provide evidence that the records were those of the consenting witness. It seems clear that if the connection of the records to the witness were disputed, the "consent" document would have some materiality to the issue, that is, it would make the fact to be proved, control of the ac-

would find that issue troubling. Nevertheless, I am satisfied that our Circuit has reached the conclusion that a written communication expressing consent to disclosure of any bank records of the witness that might exist is not within the scope of the privilege. Obliged to accept that conclusion as the law of this Circuit, I concur in the opinion affirming the adjudication of contempt.[6]

count, more likely to be true than would be the case without the evidence. *See* Fed.R.Evid. 401 (using this test to define "relevant evidence"). On the other hand, evidence from the bank, which would be necessary to authenticate the records, would likely furnish such clear proof that the account is that of the witness, that evidence of his consent to disclosure arguably does not expose him to any "realistic threat of incrimination," *Fisher v. United States, supra,* 425 U.S. at 412, 96 S.Ct. at 1581.

6. Were the issue open, I would have acceded to appellants' request that the "consent" form be revised to state expressly that it is being signed "under protest." I would have thought that our supervisory power should be exercised to make clear that the "consent" is being signed, not merely pursuant to court order but also under protest. There are some documents a person would cheerfully sign pursuant to a court order. These witnesses ought to be able to make clear that a court has ordered them to sign a document they would otherwise have refused to sign. However, I agree that the "pursuant to court order" language is sufficient under the controlling authority of *Alexander.*